504 So.2d 1205 (1987)
David THORNHILL
v.
Terry WILSON, John Pittman, W.R. Selman and City of Columbia.
No. 56474.
Supreme Court of Mississippi.
April 8, 1987.
Cotton Ruthven, Waller & Waller, Jackson, for appellant.
R.A. Gray, III, Gray, Montague & Pittman, Hattiesburg, for appellees.
Before ROY NOBLE LEE, P.J. and ROBERTSON and GRIFFIN, JJ.
ROBERTSON, Justice, for the Court:

I.
The law officer's duty of reasonable investigation collides today with the citizen's interest in freedom from confinement. The defendant officers, responding to increasingly frantic entreaties from an unknown female caller that someone was firing shots in the area of an inhabited camp near the Pearl River, encountered and detained the belligerent and intoxicated plaintiff for some fifteen minutes of interrogation and investigation. In the context of the plaintiff's suit for false imprisonment, the jury found the officers' actions did not exceed the bounds of reasonableness. Having in mind familiar limitations upon our scope of review of judgments predicated upon jury verdicts, we affirm.

II.

A.
The incident in issue occurred during the evening of December 2, 1983, just outside *1206 the city limits of Columbia, Mississippi, in a swamp bordering the Pearl River. The site of the incident was a "camp" on the river owned by the late Henry "Slatts" Pope, a Columbia lawyer. The camp had been leased by Pope to David Thornhill, Plaintiff below and Appellant here.
At approximately 9:35 p.m. on the evening in question Billy Doyle Patterson, dispatcher with the Columbia Police Department, received a distress call from a young woman. The caller did not identify herself but stated that she was in a house near the Pearl River, that two small children were with her, and that someone was outside shooting in the proximity. Officer Patterson determined that the location was the Slatts Pope Camp and secured directions thereto. Because the Pope Camp was outside the city limits of Columbia, he referred the woman to the Marion County Sheriff's Office.
A short time later, at 9:47 p.m., the woman called again with a similar report of shooting and a plea for help, but this time with more concern and urgency in her voice. Patterson again referred her to the Marion County Sheriff's Office and then personally checked on the matter by calling the Sheriff's dispatcher. Mike Bosche, the Sheriff's dispatcher, confirmed that he, too, had received a call from the woman and was aware of the problem. Bosche at approximately this time dispatched to the scene Chief Marion County Deputy Sheriff Dalton Bracey and Marion County Constable Gerald Sanders. However, the dispatcher was of the impression that each was a considerable distance from the scene.
At 10:08 p.m., Patterson received yet a third call from the woman. This time she was frantic. She reported shots were directed into the house occupied by her and her two children. She pleaded for help. Patterson heard gunfire over the phone line. Two shots. "Oh, my God," the woman exclaimed, as if she had been startled by someone. The phone line then went dead.
Patterson again contacted Mike Bosche via intercom. Bosche had previously dispatched Deputy Bracey and Constable Sanders to the scene, but, because of their distances from the scene, they could not reach it for an appreciable time, and Bosche had no other officer who could respond immediately. He reported to Patterson that he had no one available who could lend immediate assistance. Patterson did. The Pope Camp was only a short distance beyond the Columbia city limits. Nearby were city units which could respond almost immediately. Patterson conferred with W.R. Selman, a Columbia alderman who had stopped by the police station. Alderman Selman was one of the Defendants below and is an Appellee here. Patterson described the situation to Selman and advised him that it appeared life-threatening. Selman authorized Patterson to send help.
Patterson dispatched two officers. Dalton Bracey and Mike Bosche of the Sheriff's office were aware of their dispatch and offered no protest. The senior officer dispatched was John Pittman, another of the Defendants below and an Appellee here, a 53-year-old veteran of sixteen years in law enforcement. Pittman was also at the time serving as a Marion County constable, but his "home" beat did not include the location of the Pope Camp. The second officer, who was in a separate vehicle, was Terry Wilson, a 23-year-old patrolman with two and one-half years law enforcement experience. Wilson is the final Defendant/Appellee.
Meanwhile, as Officers Pittman and Wilson approached, Thornhill was sitting in his pickup truck near the entrance to the Pope camp, parked on a logging trail off the drive to the camp. He had been drinking. According to his testimony, Thornhill was lying in wait in an effort to catch whoever was responsible for the inordinate amount of gunfire in the vicinity of the Pope camp that night.
Terry Wilson was the first officer to arrive at the drive leading to the Pope camp. The time was about 10:10 p.m., only several minutes after Billy Doyle Patterson's last contact with the frantic female caller. Wilson proceeded slowly down the drive, peering into the woods with the spotlight of his marked police car. When he arrived within some 30 feet of Thornhill's *1207 truck, Thornhill turned his headlights on Wilson's car, which frightened Wilson. Wilson responded by turning his spotlight on the truck, drawing (but not aiming) his service revolver, exiting his car and crouching behind its hood, and activating his PA system. He identified himself and told the occupants of the truck to step out. Only after the third such directive did Thornhill and his cousin comply. Wilson instructed them then to place their hands on the hood of the truck where he could see them, for his own safety, and, when he saw they had nothing in their hands, he reholstered his revolver.
Thornhill was from the outset belligerent, hostile, defiant, and uncooperative. He cursed Pittman and Wilson. To complete their mission and insure their safety in the process, the officers frisked Thornhill and his cousin and placed them in the rear seat of Wilson's patrol car while they went to check on conditions at the Pope camp. John Pittman's frisking of Thornhill produced a knife.
With Thornhill and his cousin in the rear seat of Wilson's car, Wilson, followed by Pittman, traveled to the Pope camp, both followed by Constable Gerald Sanders, who had arrived on the scene. There they found Rhonda Thornhill, Thornhill's wife, and Thornhill's two small children. John Pittman spoke with Rhonda Thornhill on the front porch of the camphouse, while David Thornhill screamed threats and obscenities from the rear seat of Wilson's car. Mrs. Thornhill reported at trial that Pittman was most courteous to her. She denied to Pittman that there had been any disturbance at the Pope camp and that she had not summoned any help from law enforcement authorities. With that, the officers immediately returned Thornhill and his cousin to Thornhill's truck. They quickly examined weapons visible in the truck to be certain they were unloaded, for their own protection. The officers then released Thornhill and his cousin, and they departed the Pope property. Thornhill was as belligerent when the officers left as when they had arrived. Other county officers who had gathered at the scene departed shortly thereafter. The entire episode lasted only some fifteen minutes.
The source of the calls which led to the incident was never determined.

B.
David Thornhill commenced this civil action on January 3, 1984, when he filed his complaint in the Circuit Court of Marion County, Mississippi. Named as Defendants were Officers Wilson and Pittman, Alderman Selman and the City of Columbia. Thornhill asserted claims for false imprisonment, conversion, assault, slander and further claimed that Defendants had violated rights secured to him by the Constitution of the United States and of the State of Mississippi, presumably proceeding under 42 U.S.C. § 1983. The Defendants answered and denied the essential allegations of the complaint. The case was called for trial in the Circuit Court on May 30, 1984. The Circuit Court directed a verdict for the Defendants on the assault and battery claim and submitted all other issues to the jury. On May 31, 1984, the jury returned its verdict finding for all Defendants.
Thereafter, Thornhill moved for a new trial. Rule 59, Miss.R.Civ.P. On June 29, 1984, the Circuit Court overruled and denied the motion for a new trial. Thornhill has perfected his appeal to this Court where the matter is now ripe for review.

III.

A.
Our law respects the individual's interest in freedom from confinement. The decision to afford this respect proceeds from long felt notions of the inviolability of the person. See In Re Brown, 478 So.2d 1033, 1039 (Miss. 1985); Thompson v. State, 206 So.2d 195, 198 (Miss. 1968). Correlative to each person's duty to respect this interest in each other is the right of recovery of and from one who falsely confines another. See Restatement (Second) of Torts, §§ 35, et seq. (1965); Prosser and Keeton, The Law of Torts § 11 (5th ed. 1984).
*1208 The tort of false imprisonment involves two elements: detention of the plaintiff and the unlawfulness of such detention; imprisonment and the falsity thereof. State For the Use of Powell v. Moore, 252 Miss. 471, 174 So.2d 352, 354 (1965); Hart v. Walker, 720 F.2d 1436, 1439 (5th Cir.1983). Here there can be no question but that Thornhill was detained by Officers Pittman and Wilson acting at the behest of Alderman Selman and as officers of the City of Columbia.
Our focus is upon the legality vel non of Thornhill's detention. This leads in turn to an inquiry into the reasonableness of the actions of Officers Pittman and Wilson. See J.C. Penney Co. v. Cox, 246 Miss. 1, 10, 148 So.2d 679, 683 (1963); State For the Use of Kelley v. Yearwood, 204 Miss. 181, 194, 37 So.2d 174, 176 (1948). See also Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, 296 (1967); Anderson v. Nosser, 456 F.2d 835, 838 (5th Cir.1972).
Thornhill presents an excessively formalistic approach. If the detention was technically an "arrest," he argues Pittman and Wilson were without probable cause. If the detention was a "stop and frisk" detention, he argues that the officers exceeded their limited authority in that regard. Finally, he argues that the officers were outside their territorial jurisdiction and were mere private citizens and as such had no stop and frisk authority.
Eschewing formalistic jurisprudence, our concern is whether the actions of Pittman and Wilson in detaining Thornhill were objectively reasonable in their nature, purpose, extent and duration. We make this inquiry by reference to the totality of the circumstances reasonably apparent to persons situated as were Pittman and Wilson at the time.
It may well be that David Thornhill was in effect under arrest. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Nothing turns on the point, for in the present context our law affords a defense to one sued for false imprisonment that the plaintiff was temporarily detained for reasonable investigative purposes. Restatement (Second) of Torts, § 120A (1965); Prosser and Keeton, The Law of Torts § 22, pp. 141-42 (5th ed. 1984).
On the basis of these principles, this Court has in other contexts authorized a number of reasonable detentions, justified by reasonable suspicion, short of probable cause. Griffin v. State, 339 So.2d 550 (Miss. 1976) (suspected shoplifter held for questioning); Singletary v. State, 318 So.2d 873 (Miss. 1975) (suspected bank robber and store burglar stopped in auto); Chapman v. State, 284 So.2d 525 (Miss. 1973) (speeders held for identification in connection with other crime); Dotson v. State, 260 So.2d 839 (Miss. 1972) (suspected post office box burglary held by reason of peculiar gait and furtive movement); Williams v. State, 210 So.2d 780 (Miss. 1968) (suspected house burglar held for fingerprinting).
Nor is there any reason on principle why such detention should become per se unreasonable after the relatively brief period necessary to "stop and frisk." See United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed. 605, 615 (1985); United States v. Place, 462 U.S. 696, 709-10, 103 S.Ct. 2637, 2645-46, 77 L.Ed.2d 110, 122 (1983). The law allows, indeed commands, that its officers investigate possible criminal activity. Reasonable opportunities therefor are conferred consistent with and without unnecessary sacrifice of the individual's interest in freedom from confinement. See Michigan v. Summers, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 68 L.Ed.2d 340, 348 (1981). A detention reasonable at its inception, however, may become unreasonable, and the imprisonment thus false, when it continues past the point where the officers' objectively reasonable needs for the detention cease to exist. See McNeely v. State, 277 So.2d 435, 437 (Miss. 1973).

B.
Our review of the facts, of course, is undertaken in the context of a jury's verdict having been rendered for all defendants. In this context we are required to consider all of the evidence  not just the *1209 evidence which supports Defendants' case  in the light most favorable to the Defendants, who must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in David Thornhill's favor that reasonable men could not have arrived at a contrary verdict, we must reverse and render  at least on the issue of liability. On the other hand, if there is substantial evidence in the record consistent with the verdict, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might have reached different conclusions one from the other, it follows that the motion for directed verdict and its post-trial renewal were correctly denied and that the jury's verdict should be allowed to stand. See, e.g., McIntosh v. Deas, 501 So.2d 367, 370 (Miss. 1987); Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss. 1985); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478-79 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
The above standards in mind, the reasonableness of Pittman and Wilson's detention of Thornhill may be tested at three points: at the time Thornhill was originally detained by Officers Pittman and Wilson, at the time Thornhill was taken in the officer's car to the house where his wife, Rhonda Thornhill, was questioned, and at the time the officers took him back out to his vehicle to search for weapons. At oral argument, counsel for Thornhill acknowledged that the detention was nonactionable up to the point where Mrs. Thornhill was questioned.
Beyond that, counsel argues vigorously that upon receiving Mrs. Thornhill's advice that there was no trouble, Pittman and Wilson should have released Thornhill. After that moment the detention became unreasonable and actionable, or so we are told. The record suggests that Thornhill's detention continued approximately five minutes after the officers' conversation with Mrs. Thornhill. The officers kept Thornhill in the police vehicle and drove back out to the point where his vehicle was situated. They there conducted a search for weapons. Considering the reports received from the never-identified woman who called the Columbia Police Department dispatcher, coupled with the fact that Thornhill was agitated and at least somewhat intoxicated, we are not prepared to second-guess the jury's obvious determination that it was reasonable for Officers Pittman and Wilson, rather than accepting Mrs. Thornhill's report that there was no trouble and releasing Thornhill, to make a further investigation for a weapon or weapons, perhaps recently fired. Having in mind the standards enumerated above, we certainly cannot say that the jury disregarded its oath in finding this additional five minutes detention reasonable both in its purpose, duration or extent.
Thornhill argues further, and in the alternative, that as the evidence was contrary to the verdict, a new trial should have been granted. Here a different standard is invoked than above, for we are concerned with the weight of the evidence as distinguished from its sufficiency. Suffice it to say that in numerous cases we have held that reversal for failure to grant a new trial is proper only when it is manifest that the trial judge's denial constitutes an abuse of discretion. Maryland Casualty Co. v. City of Jackson, 493 So.2d 955, 961 (Miss. 1986); Anchor Coatings, Inc. v. Marine Industrial Insulation, Inc., 490 So.2d 1210, 1215 (Miss. 1986); Clark v. Columbus & Greenville Railway Co., 473 So.2d 947, 950 (Miss. 1985); Rule 59, Miss.R.Civ.P.
We hold that the jury's verdict in favor of all Defendants on the false imprisonment claim is, on this record, beyond our authority to disturb. This being the case, all other issues tendered by the parties, and these are several, fall by the wayside.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.