IRVING, J.,
for the Court.
¶ 1. A Lauderdale County jury convicted James Robert Delker of felony DUI as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2007).[1] The Lauderdale County Circuit Court sentenced him to five years in the custody of the Mississippi Department of *312 Corrections (MDOC). Aggrieved, Delker appeals and presents five issues, which, for the sake of organizational structure and continuity of discussion, we recast as follows: (1) whether the circuit court erred in failing to grant Delker’s pretrial motion to suppress evidence, and (2) whether Delker was denied due process during his trial proceedings.
¶ 2. After careful consideration and review of the record, we find no reversible error. Therefore, we affirm Delker’s conviction and sentence.
FACTS
¶ 3. The underlying facts of this case are undisputed. Ben Langston, the Chief of Police for the town of Marion, Mississippi, was on duty the night of Christmas Eve 2005. At approximately 11:00 p.m., Chief Langston was in his patrol car at the entrance of the Valley Ridge Apartments, which are located on the south side of Old Country Club Road. Old Country Club Road runs east to west and was, therefore, perpendicular to Chief Langston’s position at the time. Although the Valley Ridge Apartments are within the corporate limits of the town of Marion, Old Country Club Road is not. However, Chief Langston mistakenly believed that it was.[2]
¶ 4. As Chief Langston was exiting the driveway entrance to the Valley Ridge Apartments, Delker was driving his car east down Old Country Club Road. Chief Langston’s patrol car was not equipped with radar, but based on his training, Chief Langston believed that Delker was driving approximately forty-five miles per hour. The posted speed limit on Old Country Club Road was thirty-five miles per hour. Chief Langston pulled onto Old Country Club Road and attempted to stop Delker to give him a speeding warning. Although Chief Langston turned on his flashing lights, Delker did not stop; instead, he continued to drive until he reached his home, where he pulled into his driveway. While driving home, Delker reached speeds as high as approximately sixty-five miles per hour and failed to stop at a posted stop sign. Chief Langston followed Delker until he pulled into his driveway.
¶ 5. Chief Langston approached Delker’s ear and asked Delker why he did not stop for him. Delker replied that he “knew he was going to go to jail, and he didn’t want to leave his car along side the roadway.” At that point, Chief Langston smelled intoxicating beverage emanating from Delker’s car. Chief Langston asked Delker to get out of the car so he could talk to him. Although Delker got out of the car, he had trouble doing so. Chief Langston smelled intoxicating beverage coming from Delker’s person and noticed that Delker had difficulty standing. According to Chief Langston, Delker’s “speech was a little slurred,” and “[h]e was kind of swaying, holding, kind of supporting himself on his vehicle.” At that point, Chief Langston handcuffed Delker because he knew, from an earlier encounter, that his driver’s license was suspended. He then placed Delker in the back seat of his patrol car.[3]
¶ 6. While pursuing Delker, Chief Lang-ston radioed for assistance from the Laud-erdale County Sheriffs Department. Approximately five minutes after Chief Langston arrived at Delker’s home, several Lauderdale County deputies also ar *313 rived. Deputy Karey Williams was among them. Deputy Williams transported Delker to the Lauderdale County Jail and administered field sobriety tests, parts of which Delker failed. Deputy Williams asked Delker to blow into the Intoxilyzer 8000 machine, but Delker declined to do so.
¶ 7. On January 3, 2006, Deputy Williams formally charged Delker for felony driving under the influence of alcohol and driving with a suspended driver’s license. That same day, Chief Langston charged Delker with reckless driving. Delker was subsequently indicted for felony DUI as a habitual offender. He waived arraignment and pleaded not guilty to the charge. The case was initially set for trial on October 11, 2006. However, it was continued several times, and the trial ultimately occurred on September 17, 2007.
¶ 8. Prior to trial, Delker filed a motion in which he sought to suppress the following evidence:
(a) Any and all intangible items acquired by the State of Mississippi as a result of a search of the defendant and/or his property subject to his control.
(b) Any and all tangible items and/or purported admissions acquired from the defendant or his personal possessions at the time of or subsequent to any search made as a result of an arrest of the defendant and/or interrogatories of the defendant or statements made by others.
(c) Any and all statements made by or taken from the defendant.
(d) Any and all statements made by any person or persons, law enforcement or otherwise, at the time of or subsequent to the search and/or arrest of the defendant.
(e) Any and all other information, items or evidence of all kinds and character, wherever situated, taken or acquired, either directly or indirectly from the defendant or as a result of the search and/or arrest of the defendant, if any.
¶ 9. The circuit court overruled the motion to suppress, finding that although Chief Langston was outside of his territorial jurisdiction, he, as a private citizen, could effectuate Delker’s arrest. The circuit court reasoned that Delker committed a misdemeanor offense in Chief Langston’s presence and that since any private citizen could have effectuated the arrest, Chief Langston, as a private citizen, was also authorized to make the arrest. As stated, the jury found Delker guilty of felony DUI. During the bifurcated habitual offender portion of the trial, the circuit court found that Delker qualified for sentencing as a habitual offender pursuant to section 99-19-81. Accordingly, the circuit court sentenced Delker to five years in the custody of the MDOC.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 10. In reviewing a circuit court’s decision to deny a motion to suppress evidence, we must determine whether the circuit court’s findings, “considering the totality of the circumstances, are supported by substantial credible evidence.” Moore v. State, 933 So.2d 910, 914(119) (Miss.2006). “The standard of review in Mississippi for questions of law is de novo.” Farris v. State, 764 So.2d 411, 428(¶ 57) (Miss.2000).

1. Suppression of the Evidence

¶ 11. Delker’s core argument is that Chief Langston had no authority to stop or arrest him, because he never committed any offense in Chief Langston’s jurisdiction. Relying upon Pollard v. State, 233 So.2d 792, 793 (Miss.1970), Delker further *314 argues that his arrest occurred when the pursuit to make the arrest began and that he had not committed any felony at that time. However, we find at that time, Delker had committed an indictable offense because he had committed the offense of felony DUI, although that fact was not known to Chief Langston when he attempted to detain Delker to give him a speeding warning. While Delker focuses entirely on the illegality of his arrest, focus should also be directed to the fact that this appeal involves prosecution and conviction for felony DUI, an offense for which Chief Langston did not arrest Delker, although it is an offense that was discovered as a result of the stop made by Chief Langston.
¶ 12. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18(¶ 21) (Miss.2006). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). “The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment.” Id. “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ within the meaning of this provision.” Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted).
¶ 13. We begin our analysis and discussion with a look at two matters that we find very relevant: the time of Delker’s arrest and the offense(s) that he had committed at that time. We noted at the outset that Delker was arrested after he arrived at his home and got out of his car. At that time, Delker had committed the crime of felony DUI, as well as the crime of driving with a suspended license. We make this finding fully aware that the Mississippi Supreme Court has held on several occasions that an arrest occurs when the pursuit to make the arrest begins.[4] However, it is clear here that when Chief Langston began his pursuit of Delker, it was not a pursuit for the purpose of making an arrest. Rather, it was a pursuit to give a courtesy warning. The following exchange, which occurred between Delker’s attorney and Chief Langston during the trial, provides the factual underpinning for this point:
Q. And when you first observed the vehicle that you later identified as being driven by the Defendant, which direction was it coming from?
A. It was coming from westbound; it was traveling east.
Q. Okay. And when you first observed the vehicle, what caught your attention, if anything?
A. It’s [sic] speed.
Q. Do you know what the posted speed limit is in that area?
A. It’s 35.
Q. And what specifically about the speed caught your attention?
A. It appeared to me to be traveling over the 35-mile-an-hour speed, posted speed.
*315 Q. So at that point in time, did you engage your emergency lights?
A. After I got on the roadway, yes, I did.
Q. What was the purpose of you engaging your emergency lights?
A. To perform a traffic stop on the vehicle and advise the driver to slow down.
Q. And that was the reason you were going to stop him?
A. Yes, sir.
Q. Were you going to issue him a warning at that time?
A. Yes, sir.
Q. Just a warning?
A. Yes, sir.
(Emphasis added).
¶ 14. Thus, since it is undisputed that the purpose of the pursuit was to give a courtesy warning to Delker to slow down, not for the purpose of making an arrest, no arrest occurred when the pursuit began. Even after Chief Langston had pursued Delker for some distance, he still had no intention of arresting Delker. Again, this fact is borne out by the following exchange between Chief Langston and the prosecutor:
Q. And there is a stop sign [at the intersection of Old Country Club West Road and Lizelia Road]?
A. Yes, ma’am.
Q. Car is at the stop sign?
A. Yes, ma’am.
Q. Tell us how Mr. Delker goes around this car.
A. He goes out to the left side of that vehicle, just real suddenly to the left of the vehicle and makes the turn, left turn onto Lizelia Road and continues north of Lizelia Road.
Q. What do [sic] you do as you approached the intersection?
A. I do [sic] the same thing.
Q. Okay. So — and where do you travel from there?
A. We go north on Lizelia until Van Zyverden Road, where he turns back and heads west on Van Zyver-den Road.
Q. And was there anything out of the ordinary about that turn?
A. When he turned onto that roadway, he crossed the eastbound lane of Van Zyverden Road to get to the westbound lane.
Q. Okay. Now, at this point, what are your intentions with this red car?
A. Well, at that point, was to stop and see at that time what was going on with the subject, why they wouldn’t stop for me.
(Emphasis added).
¶ 15. It is undisputed that Delker was not physically restrained until he got out of his car after pulling into his driveway. On this point, the record reflects that the following exchange occurred between Chief Langston and the prosecutor:
Q. Now in your opinion, did the car stop because of your lights or did he [sic] stop for another reason?
A. He stopped because he had made it home.
Q. Okay. When you got to this residence, what did you do once you got out of your patrol car?
A. When I got out of my vehicle, I went up to the subject’s vehicle and I asked him why didn’t he stop for me.
Q. And what did he tell you?
A. He told me he knew he was going to go to jail, and he didn’t want to leave his car along side the roadway.
[[Image here]]
*316 Q. All right. Went up to the vehicle; what happens next?
A. Went up to the vehicle. I asked him why he didn’t stop for me. He advised me he knew he was going to go to jail, he wanted to go home. I smelled intoxicating beverage coming from within the vehicle. I had the subject get out of the vehicle to talk to me. I noticed he had problems getting out of the vehicle. He got out while I was standing there talking with him. I smelled intoxicating beverage coming from his persons [sic], and talking with him, he had problems standing. He was kind of swaying, holding, kind of supporting himself on his vehicle at that time. I handcuffed him because I knew his driver’s license was suspended from prior [sic], I handcuffed him and placed him in the back seat of my vehicle.
(Emphasis added).
¶ 16. Based on the unique facts recited above, we find Pollard distinguishable. When Delker was arrested, it is clear and not debatable that he had committed the crime of felony DUI, as well as the crime of driving with a suspended license. It is not disputed that Delker was driving under the influence after having been convicted twice previously within five years prior to the date of this offense. Pursuant to Mississippi Code Annotated section 63 — 11—30(2)(c) (Supp.2008), the third such offense is a felony, an indictable offense. When the law is applied to these facts, it is readily apparent that Delker’s prosecution for driving under the influence was legal.
 If 17. Mississippi Code Annotated section 99-3-7(1) (Rev.2007) provides:
An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested.
(Emphasis added). As stated, when Chief Langston began to pursue Delker, Delker had committed felony DUI, an indictable offense, although this fact was unknown to Chief Langston at the time. Therefore, the appropriate question at this juncture is whether, under section 99-3-7(1), a private citizen must possess knowledge that the citizen that he proposes to arrest has committed an indictable offense. A plain reading of the statute answers the question in the negative. Under the authority granted by the italicized portion of section 99-3-7(1), knowledge that an indictable offense has been committed is not a prerequisite for the authority to make an arrest. Obviously, a private citizen who arrests another who has not committed an indictable offense acts at his peril.
¶ 18. The circuit court found that Delker had committed a misdemeanor in Chief Langston’s presence and that this fact empowered Chief Langston to effectuate a citizen’s arrest. We disagree with the circuit court on this point, because, under section 99-3-7(1), the only non-felony or non-indictable offense committed in a citizen’s presence that gives rise to his authority to arrest the perpetrator is an offense constituting a breach of the peace threatened or attempted. We fail to see how Delker’s speeding constituted a breach of the peace. However, it is well-settled law that an appellate court may affirm the trial court if the trial court *317 reached the right result, although for the wrong reason. Jackson v. State, 811 So.2d 840, 342(¶ 6) (Miss.Ct.App.2001) (citing Puckett v. Stuckey, 633 So.2d 978, 980 (Miss.1993)). Therefore, we affirm the circuit court’s determination that Delker’s arrest was legal, although on the alternative basis that Delker had committed an indictable offense at the time that he was arrested.
¶ 19. Although we have distinguished Pollard, we find it appropriate to say more. Pollard involved a case where the law enforcement officer in question arrested William T. Pollard without a scintilla of evidence that any crime, much less a felony, had been committed. The pertinent facts in Pollard are as follows:
On the afternoon of February 26, 1968, [Pollard] left Memphis for the Sardis Reservoir to check on the water pipes of his trailer located there. Just before dark he stopped at a truckstop off of Interstate 55 for a cup of coffee. He was not feeling well and put his head down on the steering wheel to rest.
Mrs. Sullivan, a waitress in the restaurant, noticed [Pollard] in this position through the plate glass window. When Sid Steele, a deputy sheriff of two months, came into the restaurant a short time later, Mrs. Sullivan asked him to check on [Pollard] because she thought he might be ill. Although Steele was not on duty at the time and was dressed in sports clothes to attend a social function, he remarked: “We will lock him up and let him sleep it off just as soon as I get through with this sandwich.”
Mrs. Sullivan noticed that [Pollard] was leaving the parking area and told Steele, who immediately started after [Pollard] in his own car, a 1960 Pontiac Bonneville. This was an unmarked car; however, there were two red lights located about the middle of the front grille. Deputy Steele pursued [Pollard] up the ramp to the interstate, and then south on Interstate 55. During the chase several pistol shots were exchanged between Steele and [Pollard]. [Pollard] later stopped, was pulled out of his car and placed under arrest.
Pollard, 233 So.2d at 792-93.
¶ 20. It is clear that in Pollard, Deputy Steele acted with reckless disregard of Pollard’s constitutional rights. His conduct is the exact kind of conduct that the exclusionary rule is designed to deter and protect against. It cannot be legitimately argued under any scenario that Pollard’s arrest was reasonable.
¶ 21. Chief Langston’s conduct cannot be compared to Deputy Steele’s in any respect. When law enforcement officers acting beyond their territorial jurisdiction have acted reasonably and with good intentions in their detention or arrest of a citizen, our supreme court has looked favorably upon their actions. Two such cases are Thornhill v. Wilson, 504 So.2d 1205 (Miss.1987) and Nash v. State, 207 So.2d 104 (Miss.1968). Both of these cases involve legal action arising out of an arrest or detention of a citizen by law enforcement officials who were acting outside of their territorial jurisdiction when they made the arrest or effectuated the detention.
¶ 22. In Thornhill, John Pittman and Terry Wilson, officers of the city of Columbia Police Department, took David Thorn-hill into custody in Marion County while investigating a shooting that had occurred outside of the territorial jurisdiction of the city of Columbia. Thornhill, 504 So.2d at 1206-07. Officer Wilson arrested or detained Thornhill after he found him in his truck parked on a logging trail near the entrance to the camp where the shooting was alleged to have occurred. Id. at 1206. Thornhill was detained approximately fif *318 teen minutes. During this fifteen-minute detention, he was frisked for weapons, placed in the back seat of the officer’s vehicle, and driven to the camp where the shooting had occurred. He was returned later to his truck and allowed to go free after the officers checked to make sure that weapons, which were visible in the truck, were unloaded. Id. at 1206-07.
¶ 23. As a result of this incident, Thorn-hill filed a suit for false imprisonment, conversion, assault, and slander against: the city of Columbia; Officer Pittman; Officer Wilson; and W.R. Selman, an aider-man for the city of Columbia who gave permission for Officers Pittman and Wilson to investigate the shooting despite the fact that he knew that the shooting had occurred outside the territorial jurisdiction of the city of Columbia. Id. at 1207. A jury returned a verdict for all of the defendants, and Thornhill moved for a new trial. This motion was overruled, and Thornhill appealed. In affirming the judgment of the circuit court, which allowed the jury verdict to stand, our supreme court preter-mitted the question of whether Thornhill’s arrest or detention was illegal because Officers Wilson and Pittman were acting ex-traterritorially when they detained or arrested him. The Thornhill court chose instead to look at the reasonableness of the officers’ actions based on a totality of the circumstances:
Here, there can be no question but that Thornhill was detained by Officers Pittman and Wilson acting at the behest of Alderman Selman and as officers of the City of Columbia.

Our focus is upon the legality vel non of Thornhill’s detention. This leads in turn to an inquiry into the reasonableness of the actions of Officers Pittman and Wilson.

Thornhill presents an excessively formalistic approach. If the detention was technically an “arrest,” he argues Pittman and Wilson were without probable cause. If the detention was a “stop and frisk” detention, he argues that the officers exceeded their limited authority in that regard. Finally, he argues that the officers were outside the territorial jurisdiction and were mere private citizens and as such had no stop and frisk authority.
Eschewing formalistic jurisprudence, our concern is whether the actions of Pittman and Wilson in detaining Thornhill were objectively reasonable in their nature, purpose, extent and duration. We make this inquiry by reference to the totality of the circumstances reasonably apparent to persons situated as were Pittman and Wilson at the time. It may well be that David Thornhill was in effect under arrest.
Id. at 1208 (citations omitted) (emphasis added).
¶ 24. In Nash, 207 So.2d at 105, I.V. Nash was arrested in Neshoba County by the Sheriff of Scott County and one of his deputies. Nash was prosecuted and convicted for manslaughter by culpable negligence. Id. Nash appealed, and argued that the arrest was illegal, because the Sheriff of Scott County and his deputy had no authority to arrest him outside of Scott County. Id. On appeal, our supreme court stated the pertinent facts as follows:
[The sheriff and his deputy] knew that a man, while stopped off the side of the highway, had been struck and killed by a car and that the driver had not stopped. They knew they were looking for I.V. Nash, but the record does not disclose whether they knew I.V. Nash personally.
The sheriff and his deputy went to the intersection of the road leading to Nash’s father’s home with Highway 21 in Neshoba County. They had searched *319 about an hour before finding appellant. A car came from a little country road into Highway 21 and seemed about to come into the side road were [sic] the officers were but suddenly turned and headed north. The sheriff said “we” [sic] hollered at them and they stopped. Nash and some others were in the car. The officers told the occupants to get out because they wanted to talk to them. According to Mr. [R.D.] Simmons, [Sheriff of Scott County,] the officers asked the occupants if they knew anything about the accident. Nash spoke up and said that there was no need to hold anybody else because he was the one the officers wanted. The sheriff testified that when they stopped the car, Nash immediately started talking, saying that he was the one they were looking for and that he killed his best friend. This statement was before any arrest. There had been no charge against Nash. After Nash had made these statements, the sheriff directed him to get into the officers’ car[.] Nash ivas then taken to his father’s home, permitted to go in for a few moments, and, upon returning, was taken to Scott County.
Id. (emphasis added).
¶ 25. With respect to the issue of the illegality of Nash’s arrest, the trial court held that the sheriff and his deputy were in pursuit of a fleeing offender, even though it is clear on the facts that they were not in hot pursuit because they had not seen Nash. Nevertheless, the State argued on appeal that the trial court was correct in its ruling, but if not, then the sheriff had the right to make the arrest as a private citizen. Id. at 106. In deciding the issue, the Nash court stated:
Under the facts herein shown there was probable cause to believe (1) a felony had been committed and (2) that Nash was the guilty party. We conclude on the basis of the above cited authorities that • the appellant’s arrest was lawful since under the facts stated a private citizen had the right to arrest.
Id. at 107 (citations omitted).
¶ 26. Of particular significance in Nash is the supreme court’s finding that Nash’s arrest did not occur when the Sheriff of Scott County and his deputy began their pursuit of Nash, nor did it occur at the time they stopped Nash’s car. Based on the finding in Nash as to when Nash’s arrest occurred, it is reasonable to conclude in our case that Delker’s arrest did not occur when Chief Langston began his pursuit of him. Based on Nash, we find that Delker’s arrest occurred after Chief Langston discovered that Delker had been driving under the influence as a twice-prior offender. Thornhill is significant because in it, our supreme court recognized that it is the reasonableness and totality of the circumstances surrounding the actions of a law enforcement officer that determine whether the actions taken should be deemed legal.
¶ 27. Even if we were to find that Chief Langston’s arrest of Delker was unlawful, based on the United States Supreme Court’s holding in Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), we would still find that evidence of Delker’s driving under the influence should not be suppressed. In Herring, the Supreme Court held:
To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.
*320 Id. at 702. We do not find that Chief Langston’s mistake concerning the location of the municipal limits of the town of Marion arises to the standard of conduct articulated in Herring. While Thornhill was decided before Herring, it seems that much of the reasoning applied in it is consistent with Herring.
¶ 28. We also find that Moore v. State, 986 So.2d 928 (Miss.2008) provides some guidance even, though it does not involve mistaken territorial jurisdiction. In Moore, our supreme court discussed in great detail its holding in Harrison v. State, 800 So.2d 1134 (Miss.2001), wherein two sheriffs deputies stopped a Billy Daniel Harrison Jr. “for traveling sixty-seven to seventy miles per hour in a construction zone which was marked with a sixty-mile-per-hour speed limit sign.” Moore, 986 So.2d at 933(¶ 17). The Moore court noted the Harrison court’s conclusion that “the deputies had sufficient probable cause to stop Harrison, even though their stopping Harrison was a mistake of law.”[5] Id. at 934(¶ 19). We see no reason why Chief Langston’s mistake of fact should be treated any differently from the deputy’s mistake of law in Harrison.
¶ 29. For the reasons discussed, we find no merit to Delker’s claim that evidence of his driving under the influence should have been suppressed.

2. Denial of Due Process During Trial Proceedings

¶ 30. Under this issue, Delker argues that he was denied due process of law because: (1) the indictment did not identify the predicate indictable offense on which the warrantless citizen’s arrest was based, (2) evidence obtained under color of office was not excluded, (3) the circuit court refused to find that the arrest was the product of an unlawful search and seizure, (4) the State failed to produce the local ordinance establishing authority to make a warrantless arrest for a non-indictable offense, (5) the circuit court refused to allow full cross-examination of Chief Lang-ston regarding Deputy Williams’s administration of the standardized field sobriety tests, (6) the trial judge refused to recuse from hearing posttrial motions, and (7) the circuit court refused to permit him to introduce evidence during a posttrial motion hearing establishing that there was in fact no local ordinance, order, or resolution making it a crime to drive faster than the posted speed limit sign of thirty-five miles per hour.
¶ 31. It is obvious that most of these issues are subsumed in the larger issue of whether evidence of Delker’s driving under the influence should have been suppressed because of his alleged illegal arrest. As we have already found that the evidence was legally admitted, we see no need to address this issue any further. As to the other issues, we have thoroughly considered them and find them to be without merit. However, we will briefly address one issue urged by Delker: whether the trial judge should have recused from hearing posttrial motions.
*321 ¶ 32. The basis of the posttrial motion for recusal was that on the morning of the first day of the trial, counsel for Delker sought to have additional motions heard, and the trial judge responded, “G— d— it Robert, I am tired of hearing your motions.” We first note that notwithstanding the statement, the trial judge delayed the start of the trial and heard the motions. During the hearing on the post-trial motion to recuse, the trial judge offered the following:
I don’t dispute what was said. A little bit more in detail, back on July — well, first of all, in the document entitled “Waiver of Arraignment and Entry of Plea on Non-capital Cases” this language is in the document: That all motions are to be filed, notified and heard on or before 10 days prior to trial date. And then, Mr. Delker started with, I think, Pat Jordan, an attorney, then he went to Henry Palmer and Robbie Jones. They had a conflict and then you got in. Long story short, on our order resetting the hearing, dated July 23, 2007, we continued the trial until September 17th of '07, for the reason — and the reason that case was continued was to allow motions to be heard. Then on September 6th, we did hear-you had filed a number of motions, and we heard the Motion to Suppress. I had all afternoon to hear those motions. We heard it for two hours. And then at the conclusion of that motion, I asked you, do you want to call up any of the other motions? And you said no. Well, I considered all motions [as] being waived. Then the morning of the trial, I had to qualify the jury. It’s pretty convoluted downstairs. Then, we were going to have to start our trial. I walked out to qualify the jury and you said you need to hear some more motions you had filed the day of trial, and it irritated me. And what you said in your motion is exactly accurate. I apologize for saying that, but it just hit me wrong. But for the record, I qualified the jury. Instead of starting the trial, dismissed the jury until 1:30, we went upstairs and heard motions. Is that accurate?
BY MR. ROBERT COMPTON: I think we heard them in chambers, Your Honor, but—
BY THE COURT: Well, we heard your motions.
BY MR. ROBERT COMPTON: That is an accurate statement, Your Honor.
¶ 33. We certainly do not condone the trial judge’s conduct. But we cannot find reversible error in the trial judge’s refusal to recuse. In this regard, we note that had Delker believed that the trial judge could not be fair and impartial, surely he would have sought the judge’s recusal after the statement was made, rather than waiting until after the trial was over. In any event, we have carefully reviewed the various rulings made by the trial judge during the course of the trial proceedings, and we have seen nothing that would suggest that Delker was denied due process by any of the judge’s rulings. Therefore, we find that this issue is without merit.
¶ 34. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE AND SENTENCE, AS A HABITUAL OFFENDER, OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., AND CARLTON, J., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE *322 WRITTEN OPINION. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., GRIFFIS AND ISHEE, JJ., AND JOINED IN PART BY BARNES, J.

. Section 99-19-81 provides:
Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
Interestingly, the two predicative felony offenses giving rise to Delker's habitual offender status were felony DUIs committed in 1998 in Lauderdale County. Therefore, Delker has been convicted at least five times of driving under the influence, including the felony DUI conviction which is the subject of this appeal.

. Chief Langston did not learn until two or three weeks prior to trial that Old Country Club Road was not within the corporate limits of the town of Marion.

. Prior to arresting Delker, Chief Langston observed an empty beer can on the front seat of Delker’s car. Later, upon a closer examination of the car, a nearly-empty whiskey bottle was found on the back floorboard.

. See, e.g., Pollard, 233 So.2d at 793; Smith v. State, 240 Miss. 738, 743-44, 128 So.2d 857, 859-60 (1961). See also Ford v. City of Jackson, 153 Miss. 616, 121 So. 278, 279 (1929) (holding that an officer must have probable cause to search when the pursuit to conduct the search begins).

. The Harrison court found that “Harrison had not violated the construction-zone speed limit (since construction workers were not present) or the general seventy-mile-per-hour speed limit, and that it thus necessarily followed ‘that evidence derived from the stop would be subject to suppression if the inquiry stopped there.’ ” Moore, 986 So.2d at 934(¶ 19) (citing Harrison, 800 So.2d at 1138— 39). Of course, the inquiry did not end there. The Harrison court went on to affirm Harrison's conviction for possession of a controlled substance, finding that "[biased on the totality of circumstances and the valid reasonable belief that Harrison was violating the traffic laws, the two deputies had probable cause to stop Harrison, even though it was based on a mistake of law.” Harrison, 800 So.2d at 1139(¶21).