CARLTON, J.,
dissenting:
¶ 13. I respectfully dissent from the majority’s opinion.
¶ 14. I would reverse and remand this matter to the city council.[1] I submit that the city council, and hence the circuit court in affirming the city council’s decision, acted arbitrarily and capriciously in terminating the police chief without first determining factually whether the chiefs use of police vehicles constituted use for an official public law enforcement purpose and whether Vice Mayor Gines’s direct order constituted a lawful order within his authority to issue.[2] Vice Mayor Gines lacked authority to direct this order to the police chief because compliance with the order *633 required the police chief to violate the sworn official duties vested by statute in the police chief to protect the public and prevent crime within the city’s jurisdiction. See Miss.Code Ann. § 21-21-1 (Rev.2007); Miss.Code Ann. § 45-6-3(c) (Rev.2011). No malfeasance can be predicated upon the failure to comply with such an unlawful order that is void due to its contravention of specific statutory duties vested in the police chief as chief law enforcement officer of the municipality. See Miss. Att’y Gen. Op., 2002-0749, 2003 WL 356383, Lee (Jan. 3, 2003) (mayor lacks authority to become involved in day-to-day operation of the police department or to make law enforcement decisions).[3] The record reflects that Vice Mayor Gines ordered Chief Patterson to refrain from fulfilling affirmative official “sworn” law enforcement duties of his office, as a police chief and as vested by statute, to prevent crime and to protect the community. See Miss.Code Ann. § 21-21-1; Miss.Code Ann. § 45-6-3(c). By statute, the chief of police is the chief law enforcement officer in the city and supervises the law enforcement duties of the police officers. See Miss.Code Ann. § 21-21-1; Miss.Code Ann. § 21-21-3 (Rev.2007). Clearly, a municipality is statutorily obligated to provide police protection to all of its citizens pursuant to Mississippi Code Annotated section 21-21-3.[4]
¶ 15. While a mayor, or a vice mayor[5] as in the case at bar, possesses superintending control over police and the affairs of a municipality to provide oversight, to observe, and to report police activities to the board, the mayor lacks authority to supervise law enforcement by the police chief or to supervise police officers on a daily basis. Neither the mayor, nor the vice mayor, are sworn law enforcement officers. See Miss.Code Ann. § 21-5-7 (Rev.2007); see also Miss. Att’y Gen. Op., 2002-0052, 2002 WL 1011178, Nickles (Mar. 8, 2002); Miss. Att’y Gen. Op., 96-0331, 1996 WL 369495, Scott (June 7, 1996).[6] I respectfully submit that the vice mayor’s direct order, underlying the termination action, constituted a void and unlawful order exceeding the scope of Vice Mayor Gines’s authority. In addition to exceeding his authority, the order contradicts the statutory authority vested in the chief of police as the chief law enforcement officer in the municipality. See Miss. Att’y Gen. Op., 2002-0052, 2002 WL 1011178, Nickles (Mar. 8, 2002) (chief of police supervises police officers, and while the city employs, regulates, and supports a sufficient police force, the municipal authorities do not get to micromanage the police department’s law enforcement duties).[7] See also Marion Cnty. v. Taylor, 55 Miss. 184, *634 184 (1877) (supervisor’s order was a nullity since order exceeded statutory authority).
¶ 16. Stated otherwise, no malfeasance of office may be predicated upon the police chiefs refusal or failure to comply with the unlawful and invalid order given herein by the vice mayor. The order at issue directed the chief of police to refrain from fulfilling the official sworn duties of his position as chief law enforcement officer. See Miss.Code Ann. § 21-21-1; Miss.Code Ann. § 45-6-3(c). The record reflects that as time for the Greenville fair approached in April 2010, rumors circled that a fight would occur on the fairgrounds. See Miss. Code Ann. § 45 — 6—B(c) (providing that primary duties of a sworn law enforcement officer include prevention and detection of crime and apprehension of criminals). The Greenville mall was hosting the fair event in its parking lot. After learning of the rumored fight to occur at the Green-ville fair, Chief Patterson directed off-duty police officers to park their police vehicles at a nearby police substation located within the city limits. Such actions reflect no malfeasance of office or inappropriate use of public property for private purposes. The vehicles serve as an asset and instrument to aid law enforcement to fulfill their sworn law enforcement duties. In this case, the use of the police vehicles parked near the fairgrounds, as a show of force, reflects both an effort to deter the rumored potential fight at the fair and also an effort to pre-position these assets for ready availability in the event that the rumored fight actually erupted at the fair. See Miss.Code Ann. § 45-6-3(c) (sworn law enforcement duties include crime prevention); see also Edwards House Co. v. City of Jackson, 138 Miss. 644, 644,103 So. 428, 429 (1925) (authority of municipality is limited by authority granted to it by the Legislature).
¶ 17. Vice Mayor Gines’s order and unfounded assertion of malfeasance conveys an inherent assertion that the fair located in the mall parking lot was not entitled to law enforcement protection from crime by the City of Greenville or its police force because off-duty officers worked there as private security. The outside private employment of these police officers fails to relieve the chief of police of his sworn statutory official duties as chief law enforcement officer of the municipality. Outside private employment of off-duty police officers fails to impact the duty of the municipality and its police chief to protect and prevent crime previously rumored to occur at this public event within the municipal jurisdiction.[8] See Miss.Code Ann. § 21-21-1; Miss.Code Ann. § 21-21-3; Miss.Code Ann. § 45-6-3; see generally Miss. Att’y Gen. Op., 1992 WL 614119, Ross (Aug. 26, 1992) (providing that since the Legislature has not delegated exclusive power specifically over State fairgrounds to a particular entity, nor has it taken away such power from the City of Jackson, the city retains jurisdiction over violations of state statutes at the fairgrounds).[9]
¶ 18. With respect to the alleged use of the vehicles for private employment, the record indicates that the police vehicles were being parked at a previously established police substation. No dispute appears in the record regarding the location of the parked vehicles at a police substation. Thus, logically from these facts, the *635 police vehicles were parked at an authorized official law enforcement location. The record moreover reflects that Chief Patterson was not working for a private employer or private purpose. The record shows that Chief Patterson was serving in his official public capacity as chief of police acting for a public law enforcement purpose when directing that the vehicles be parked at this previously established police substation near the rumored fight and the fair venue. The record does not indicate that the vehicles were being utilized for any private purpose or for a private employer but, instead, the record reflects use for a public law enforcement purpose of crime prevention by parking vehicles at the police substation, providing ready availability and assisting crime prevention by scaring off “would-be fighters” at the public event.[10] As previously acknowledged, a municipality bears a statutory obligation to protect all of its citizens pursuant to section 21-21-3. See Miss. Att’y Gen. Op., 98-0102, 1998 WL 156073, Walker (Mar. 6, 1998) (“Whether a police chief is using a police car primarily in the performance of his official duties for the city is a factual determination which the governing authorities must make, subject to review by a court of competent jurisdiction.”). Crime prevention and the protection of the public constitutes a public law enforcement purpose falling within the scope of duty of the municipal police chief.
¶ 19. Mississippi Code Annotated section 17-25-11 (Rev.2012) was enacted in 2006 and allows law enforcement to wear their official uniform and their official weapon while working off-duty and for private employers. The new authorization for such wearing of the uniforms and weapons somewhat changes the complete prohibition previously provided for by statute. However, no need exists in this case to even evaluate whether the use of a vehicle for a private employer could have been authorized, since the record on its face reflects the use of the police vehicles for the public law enforcement purpose of preventing a potential crime of violence in the city at a fair open to the public, and since the record reflects that the vehicles were parked at a previously authorized official police substation. More specifically, the vehicles at issue were parked at a nearby police substation to fulfill the public purpose of performing an affirmative law enforcement duty imposed on the city and on the city’s chief of police to protect the city’s citizens by preventing potential crime threatening injury or harm to the public at the fair within municipal jurisdiction. See Miss.Code Ann. § 99-11-3 (Supp.2012); see generally Thornhill v. Wilson, 504 So.2d 1205, 1206-07 (Miss.1987); Delker v. State, 50 So.3d 309, 316 (¶ 16) (Miss.Ct.App.2009); Scott v. City of Goodman, 997 So.2d 270, 272 n. 1 (Miss.Ct.App.2008).
¶ 20. Again, crime prevention and the protection of the public constitute public purposes, and law enforcement may use its equipment, vehicles, and other assets to fulfill these official law enforcement purposes. The Greenville fair in the mall parking lot was not rendered ineligible for municipal police protection due to the hiring of off-duty police as private security by the mall or other private employers. A municipality bears a statutory obligation to protect all of its citizens pursuant to Mississippi Code Annotated section 21-21-3, and city police possess jurisdiction over crimes within city limits. See Miss. Atty’ Gen. Op., 2004-0048, 2004 WL 555123, Redmond (Feb. 13, 2004) (municipality may also share concurrent jurisdiction *636 over crimes occurring within a city at some locations); Miss. Att’y Gen. Op., 93-0709, 1993 WL 467813, Harrell (Oct. 25, 1993) (board of aldermen has statutory duty to provide reasonable police protection for municipality). The fair was open to the public and located within the jurisdiction of the city, and upon receipt of a report of a rumored potential crime of violence to occur at this public event, Chief Patterson possessed an affirmative official public duty as chief law enforcement officer of the municipality to protect the public and prevent crime.[11]
¶ 21. Based on the foregoing, I respectfully dissent.
IRVING, P.J., AND JAMES, J., JOIN THIS OPINION.

. See Miss Att’y Gen. Op., 98-0102, 1998 WL 156073, Walker (Mar. 6, 1998).

. See Miss.Code Ann. § 45-6-3(c) (Rev.2011) (defining sworn law enforcement officer); Miss.Code Ann. § 21-21-1 (Rev.2007) (duties of the chief of police); Miss.Code Ann. § 21— 17-5 (Supp.2012) (governing authorities of municipality).

. See generally Petition of Aultman, 205 Miss. 397, 400-02, 38 So.2d 901, 901-02 (1949) (police officers bear the duty to arrest persons who commit crimes in a municipality); see also Miss. Att’y Gen. Op., 2002-0052, 2002 WL 1011178, Nickles (Mar. 8, 2002) (board of aldermen as legislative body possess responsibility to hire sufficient police and to appropriate funds for support of the police department but may not micromanage the police department without running afoul of the doctrine of separation of powers).

. See also Miss. Att’y Gen. Op., 2011-00341, 2011 WL 5006005, Warren (Sept. 2, 2011) (municipality duty to provide police protection includes duty to maintain public presence in municipal court room, but authority to ensure decorum and order in municipality's courtroom belongs to the municipal judge).

. See Miss.Code Ann. § 21-5-7 (Rev.2007) (duties of mayor). Neither the mayor, nor the vice mayor in the mayor's stead, are sworn law enforcement officers.

. See also Miss.Code Ann. § 21-31-13 (Rev. 2007) (regarding civil service).

. See also Joseph T. Bockrath, Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection, 46 A.L.R.3d 1084, 1086-1105 (1972).

. Compare Miss.Code Ann. § 25-3-25(6)(o) (Rev.2010) (acknowledging that the Sheriff of Hinds County regularly provides security for the State fairgrounds and museums in Jackson) with Miss.Code Ann. § 19-3-40 (Rev. 2012) (providing that county supervisors cannot issue orders inconsistent with a specific provision of general law).

. See also Watts v. City of Jackson, 664 F.Supp.2d 680, 685-89 (S.D.Miss.2009) (no adverse employment action may be used to retaliate for First Amendment claim).

. See Bradley v. City of Jackson, 590 F.Supp.2d 817, 823 (S.D.Miss.2008) (recognizing that in evaluating liability pursuant to § 1983, Mississippi Code Annotated section 17-25-11, while authorizing wear of uniforms and guns, did not prohibit the use of vehicles).

. See Miss. Att’y Gen. Op., 2011-00341, 2011 WL 5006005, Warren (Sept. 2, 2011); Miss. Code Ann. § 45 — 3—21 (i) (Rev.2011) (stating that the Highway Safety Patrol may respond to calls for assistance in a law enforcement incident and that such request and action shall be reflected in radio logs of Mississippi Highway Patrol district substation and the requesting agency); see also Ouzts v. State, 947 So.2d 1005, 1007-09 (¶¶ 9-19) (Miss.Ct.App.2006) (police stopped defendant in a DUI case not in prosecuting county but in second county and used substation in second county, and evidence found sufficient). The use of law-enforcement substations is recognized by statute as a lawful public use. See Miss.Code Ann. § 45-3-19 (Rev.2011) (allowing Highway Safety Patrol Commissioner to establish a headquarters and substations to carry out purpose of organization and enforcement of laws).