50 So.3d 309 (2009)
James Robert DELKER, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2008-KA-00114.
Court of Appeals of Mississippi.
September 11, 2009.
Rehearing Denied January 5, 2010.
*311 Robert H. Compton, John G. Compton, Meridian, attorney for appellant.
Office of The Attorney General By Jeffrey A. Klingfuss, attorney for appellee.
EN BANC.
IRVING, J., for the Court.
¶ 1. A Lauderdale County jury convicted James Robert Delker of felony DUI as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2007).[1] The Lauderdale County Circuit Court sentenced him to five years in the custody of the Mississippi Department of *312 Corrections (MDOC). Aggrieved, Delker appeals and presents five issues, which, for the sake of organizational structure and continuity of discussion, we recast as follows: (1) whether the circuit court erred in failing to grant Delker's pretrial motion to suppress evidence, and (2) whether Delker was denied due process during his trial proceedings.
¶ 2. After careful consideration and review of the record, we find no reversible error. Therefore, we affirm Delker's conviction and sentence.

FACTS
¶ 3. The underlying facts of this case are undisputed. Ben Langston, the Chief of Police for the town of Marion, Mississippi, was on duty the night of Christmas Eve 2005. At approximately 11:00 p.m., Chief Langston was in his patrol car at the entrance of the Valley Ridge Apartments, which are located on the south side of Old Country Club Road. Old Country Club Road runs east to west and was, therefore, perpendicular to Chief Langston's position at the time. Although the Valley Ridge Apartments are within the corporate limits of the town of Marion, Old Country Club Road is not. However, Chief Langston mistakenly believed that it was.[2]
¶ 4. As Chief Langston was exiting the driveway entrance to the Valley Ridge Apartments, Delker was driving his car east down Old Country Club Road. Chief Langston's patrol car was not equipped with radar, but based on his training, Chief Langston believed that Delker was driving approximately forty-five miles per hour. The posted speed limit on Old Country Club Road was thirty-five miles per hour. Chief Langston pulled onto Old Country Club Road and attempted to stop Delker to give him a speeding warning. Although Chief Langston turned on his flashing lights, Delker did not stop; instead, he continued to drive until he reached his home, where he pulled into his driveway. While driving home, Delker reached speeds as high as approximately sixty-five miles per hour and failed to stop at a posted stop sign. Chief Langston followed Delker until he pulled into his driveway.
¶ 5. Chief Langston approached Delker's car and asked Delker why he did not stop for him. Delker replied that he "knew he was going to go to jail, and he didn't want to leave his car along side the roadway." At that point, Chief Langston smelled intoxicating beverage emanating from Delker's car. Chief Langston asked Delker to get out of the car so he could talk to him. Although Delker got out of the car, he had trouble doing so. Chief Langston smelled intoxicating beverage coming from Delker's person and noticed that Delker had difficulty standing. According to Chief Langston, Delker's "speech was a little slurred," and "[h]e was kind of swaying, holding, kind of supporting himself on his vehicle." At that point, Chief Langston handcuffed Delker because he knew, from an earlier encounter, that his driver's license was suspended. He then placed Delker in the back seat of his patrol car.[3]
¶ 6. While pursuing Delker, Chief Langston radioed for assistance from the Lauderdale County Sheriff's Department. Approximately five minutes after Chief Langston arrived at Delker's home, several Lauderdale County deputies also arrived. *313 Deputy Karey Williams was among them. Deputy Williams transported Delker to the Lauderdale County Jail and administered field sobriety tests, parts of which Delker failed. Deputy Williams asked Delker to blow into the Intoxilyzer 8000 machine, but Delker declined to do so.
¶ 7. On January 3, 2006, Deputy Williams formally charged Delker for felony driving under the influence of alcohol and driving with a suspended driver's license. That same day, Chief Langston charged Delker with reckless driving. Delker was subsequently indicted for felony DUI as a habitual offender. He waived arraignment and pleaded not guilty to the charge. The case was initially set for trial on October 11, 2006. However, it was continued several times, and the trial ultimately occurred on September 17, 2007.
¶ 8. Prior to trial, Delker filed a motion in which he sought to suppress the following evidence:
(a) Any and all intangible items acquired by the State of Mississippi as a result of a search of the defendant and/or his property subject to his control.
(b) Any and all tangible items and/or purported admissions acquired from the defendant or his personal possessions at the time of or subsequent to any search made as a result of an arrest of the defendant and/or interrogatories of the defendant or statements made by others.
(c) Any and all statements made by or taken from the defendant.
(d) Any and all statements made by any person or persons, law enforcement or otherwise, at the time of or subsequent to the search and/or arrest of the defendant.
(e) Any and all other information, items or evidence of all kinds and character, wherever situated, taken or acquired, either directly or indirectly from the defendant or as a result of the search and/or arrest of the defendant, if any.
¶ 9. The circuit court overruled the motion to suppress, finding that although Chief Langston was outside of his territorial jurisdiction, he, as a private citizen, could effectuate Delker's arrest. The circuit court reasoned that Delker committed a misdemeanor offense in Chief Langston's presence and that since any private citizen could have effectuated the arrest, Chief Langston, as a private citizen, was also authorized to make the arrest. As stated, the jury found Delker guilty of felony DUI. During the bifurcated habitual offender portion of the trial, the circuit court found that Delker qualified for sentencing as a habitual offender pursuant to section 99-19-81. Accordingly, the circuit court sentenced Delker to five years in the custody of the MDOC.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 10. In reviewing a circuit court's decision to deny a motion to suppress evidence, we must determine whether the circuit court's findings, "considering the totality of the circumstances, are supported by substantial credible evidence." Moore v. State, 933 So.2d 910, 914(¶ 9) (Miss.2006). "The standard of review in Mississippi for questions of law is de novo." Farris v. State, 764 So.2d 411, 428(¶ 57) (Miss.2000).

1. Suppression of the Evidence
¶ 11. Delker's core argument is that Chief Langston had no authority to stop or arrest him, because he never committed any offense in Chief Langston's jurisdiction. Relying upon Pollard v. State, 233 So.2d 792, 793 (Miss.1970), Delker further *314 argues that his arrest occurred when the pursuit to make the arrest began and that he had not committed any felony at that time. However, we find at that time, Delker had committed an indictable offense because he had committed the offense of felony DUI, although that fact was not known to Chief Langston when he attempted to detain Delker to give him a speeding warning. While Delker focuses entirely on the illegality of his arrest, focus should also be directed to the fact that this appeal involves prosecution and conviction for felony DUI, an offense for which Chief Langston did not arrest Delker, although it is an offense that was discovered as a result of the stop made by Chief Langston.
¶ 12. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18(¶ 21) (Miss.2006). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment." Id. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted).
¶ 13. We begin our analysis and discussion with a look at two matters that we find very relevant: the time of Delker's arrest and the offense(s) that he had committed at that time. We noted at the outset that Delker was arrested after he arrived at his home and got out of his car. At that time, Delker had committed the crime of felony DUI, as well as the crime of driving with a suspended license. We make this finding fully aware that the Mississippi Supreme Court has held on several occasions that an arrest occurs when the pursuit to make the arrest begins.[4] However, it is clear here that when Chief Langston began his pursuit of Delker, it was not a pursuit for the purpose of making an arrest. Rather, it was a pursuit to give a courtesy warning. The following exchange, which occurred between Delker's attorney and Chief Langston during the trial, provides the factual underpinning for this point:
Q. And when you first observed the vehicle that you later identified as being driven by the Defendant, which direction was it coming from?
A. It was coming from westbound; it was traveling east.
Q. Okay. And when you first observed the vehicle, what caught your attention, if anything?
A. It's [sic] speed.
Q. Do you know what the posted speed limit is in that area?
A. It's 35.
Q. And what specifically about the speed caught your attention?
A. It appeared to me to be traveling over the 35-mile-an-hour speed, posted speed.

*315 Q. So at that point in time, did you engage your emergency lights?
A. After I got on the roadway, yes, I did.
Q. What was the purpose of you engaging your emergency lights?

A. To perform a traffic stop on the vehicle and advise the driver to slow down.

Q. And that was the reason you were going to stop him?
A. Yes, sir.
Q. Were you going to issue him a warning at that time?
A. Yes, sir.
Q. Just a warning?
A. Yes, sir.
(Emphasis added).
¶ 14. Thus, since it is undisputed that the purpose of the pursuit was to give a courtesy warning to Delker to slow down, not for the purpose of making an arrest, no arrest occurred when the pursuit began. Even after Chief Langston had pursued Delker for some distance, he still had no intention of arresting Delker. Again, this fact is borne out by the following exchange between Chief Langston and the prosecutor:
Q. And there is a stop sign [at the intersection of Old Country Club West Road and Lizelia Road]?
A. Yes, ma'am.
Q. Car is at the stop sign?
A. Yes, ma'am.
Q. Tell us how Mr. Delker goes around this car.
A. He goes out to the left side of that vehicle, just real suddenly to the left of the vehicle and makes the turn, left turn onto Lizelia Road and continues north of Lizelia Road.
Q. What do [sic] you do as you approached the intersection?
A. I do [sic] the same thing.
Q. Okay. Soand where do you travel from there?
A. We go north on Lizelia until Van Zyverden Road, where he turns back and heads west on Van Zyverden Road.
Q. And was there anything out of the ordinary about that turn?
A. When he turned onto that roadway, he crossed the eastbound lane of Van Zyverden Road to get to the westbound lane.
Q. Okay. Now, at this point, what are your intentions with this red car?

A. Well, at that point, was to stop and see at that time what was going on with the subject, why they wouldn't stop for me.

(Emphasis added).
¶ 15. It is undisputed that Delker was not physically restrained until he got out of his car after pulling into his driveway. On this point, the record reflects that the following exchange occurred between Chief Langston and the prosecutor:
Q. Now in your opinion, did the car stop because of your lights or did he [sic] stop for another reason?
A. He stopped because he had made it home.
Q. Okay. When you got to this residence, what did you do once you got out of your patrol car?
A. When I got out of my vehicle, I went up to the subject's vehicle and I asked him why didn't he stop for me.
Q. And what did he tell you?
A. He told me he knew he was going to go to jail, and he didn't want to leave his car along side the roadway.
* * * * * *

*316 Q. All right. Went up to the vehicle; what happens next?
A. Went up to the vehicle. I asked him why he didn't stop for me. He advised me he knew he was going to go to jail, he wanted to go home. I smelled intoxicating beverage coming from within the vehicle. I had the subject get out of the vehicle to talk to me. I noticed he had problems getting out of the vehicle. He got out while I was standing there talking with him. I smelled intoxicating beverage coming from his persons [sic], and talking with him, he had problems standing. He was kind of swaying, holding, kind of supporting himself on his vehicle at that time. I handcuffed him because I knew his driver's license was suspended from prior [sic]. I handcuffed him and placed him in the back seat of my vehicle.

(Emphasis added).
¶ 16. Based on the unique facts recited above, we find Pollard distinguishable. When Delker was arrested, it is clear and not debatable that he had committed the crime of felony DUI, as well as the crime of driving with a suspended license. It is not disputed that Delker was driving under the influence after having been convicted twice previously within five years prior to the date of this offense. Pursuant to Mississippi Code Annotated section 63-11-30(2)(c) (Supp.2008), the third such offense is a felony, an indictable offense. When the law is applied to these facts, it is readily apparent that Delker's prosecution for driving under the influence was legal.
¶ 17. Mississippi Code Annotated section 99-3-7(1) (Rev.2007) provides:
An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested.
(Emphasis added). As stated, when Chief Langston began to pursue Delker, Delker had committed felony DUI, an indictable offense, although this fact was unknown to Chief Langston at the time. Therefore, the appropriate question at this juncture is whether, under section 99-3-7(1), a private citizen must possess knowledge that the citizen that he proposes to arrest has committed an indictable offense. A plain reading of the statute answers the question in the negative. Under the authority granted by the italicized portion of section 99-3-7(1), knowledge that an indictable offense has been committed is not a prerequisite for the authority to make an arrest. Obviously, a private citizen who arrests another who has not committed an indictable offense acts at his peril.
¶ 18. The circuit court found that Delker had committed a misdemeanor in Chief Langston's presence and that this fact empowered Chief Langston to effectuate a citizen's arrest. We disagree with the circuit court on this point, because, under section 99-3-7(1), the only non-felony or non-indictable offense committed in a citizen's presence that gives rise to his authority to arrest the perpetrator is an offense constituting a breach of the peace threatened or attempted. We fail to see how Delker's speeding constituted a breach of the peace. However, it is well-settled law that an appellate court may affirm the trial court if the trial court *317 reached the right result, although for the wrong reason. Jackson v. State, 811 So.2d 340, 342(¶ 6) (Miss.Ct.App.2001) (citing Puckett v. Stuckey, 633 So.2d 978, 980 (Miss.1993)). Therefore, we affirm the circuit court's determination that Delker's arrest was legal, although on the alternative basis that Delker had committed an indictable offense at the time that he was arrested.
¶ 19. Although we have distinguished Pollard, we find it appropriate to say more. Pollard involved a case where the law enforcement officer in question arrested William T. Pollard without a scintilla of evidence that any crime, much less a felony, had been committed. The pertinent facts in Pollard are as follows:
On the afternoon of February 26, 1968, [Pollard] left Memphis for the Sardis Reservoir to check on the water pipes of his trailer located there. Just before dark he stopped at a truckstop off of Interstate 55 for a cup of coffee. He was not feeling well and put his head down on the steering wheel to rest. Mrs. Sullivan, a waitress in the restaurant, noticed [Pollard] in this position through the plate glass window. When Sid Steele, a deputy sheriff of two months, came into the restaurant a short time later, Mrs. Sullivan asked him to check on [Pollard] because she thought he might be ill. Although Steele was not on duty at the time and was dressed in sports clothes to attend a social function, he remarked: "We will lock him up and let him sleep it off just as soon as I get through with this sandwich."
Mrs. Sullivan noticed that [Pollard] was leaving the parking area and told Steele, who immediately started after [Pollard] in his own car, a 1960 Pontiac Bonneville. This was an unmarked car; however, there were two red lights located about the middle of the front grille. Deputy Steele pursued [Pollard] up the ramp to the interstate, and then south on Interstate 55. During the chase several pistol shots were exchanged between Steele and [Pollard]. [Pollard] later stopped, was pulled out of his car and placed under arrest.
Pollard, 233 So.2d at 792-93.
¶ 20. It is clear that in Pollard, Deputy Steele acted with reckless disregard of Pollard's constitutional rights. His conduct is the exact kind of conduct that the exclusionary rule is designed to deter and protect against. It cannot be legitimately argued under any scenario that Pollard's arrest was reasonable.
¶ 21. Chief Langston's conduct cannot be compared to Deputy Steele's in any respect. When law enforcement officers acting beyond their territorial jurisdiction have acted reasonably and with good intentions in their detention or arrest of a citizen, our supreme court has looked favorably upon their actions. Two such cases are Thornhill v. Wilson, 504 So.2d 1205 (Miss.1987) and Nash v. State, 207 So.2d 104 (Miss.1968). Both of these cases involve legal action arising out of an arrest or detention of a citizen by law enforcement officials who were acting outside of their territorial jurisdiction when they made the arrest or effectuated the detention.
¶ 22. In Thornhill, John Pittman and Terry Wilson, officers of the city of Columbia Police Department, took David Thornhill into custody in Marion County while investigating a shooting that had occurred outside of the territorial jurisdiction of the city of Columbia. Thornhill, 504 So.2d at 1206-07. Officer Wilson arrested or detained Thornhill after he found him in his truck parked on a logging trail near the entrance to the camp where the shooting was alleged to have occurred. Id. at 1206. Thornhill was detained approximately fifteen *318 minutes. During this fifteen-minute detention, he was frisked for weapons, placed in the back seat of the officer's vehicle, and driven to the camp where the shooting had occurred. He was returned later to his truck and allowed to go free after the officers checked to make sure that weapons, which were visible in the truck, were unloaded. Id. at 1206-07.
¶ 23. As a result of this incident, Thornhill filed a suit for false imprisonment, conversion, assault, and slander against: the city of Columbia; Officer Pittman; Officer Wilson; and W.R. Selman, an alderman for the city of Columbia who gave permission for Officers Pittman and Wilson to investigate the shooting despite the fact that he knew that the shooting had occurred outside the territorial jurisdiction of the city of Columbia. Id. at 1207. A jury returned a verdict for all of the defendants, and Thornhill moved for a new trial. This motion was overruled, and Thornhill appealed. In affirming the judgment of the circuit court, which allowed the jury verdict to stand, our supreme court pretermitted the question of whether Thornhill's arrest or detention was illegal because Officers Wilson and Pittman were acting extraterritorially when they detained or arrested him. The Thornhill court chose instead to look at the reasonableness of the officers' actions based on a totality of the circumstances:
Here, there can be no question but that Thornhill was detained by Officers Pittman and Wilson acting at the behest of Alderman Selman and as officers of the City of Columbia.
Our focus is upon the legality vel non of Thornhill's detention. This leads in turn to an inquiry into the reasonableness of the actions of Officers Pittman and Wilson.
Thornhill presents an excessively formalistic approach. If the detention was technically an "arrest," he argues Pittman and Wilson were without probable cause. If the detention was a "stop and frisk" detention, he argues that the officers exceeded their limited authority in that regard. Finally, he argues that the officers were outside the territorial jurisdiction and were mere private citizens and as such had no stop and frisk authority.

Eschewing formalistic jurisprudence, our concern is whether the actions of Pittman and Wilson in detaining Thornhill were objectively reasonable in their nature, purpose, extent and duration. We make this inquiry by reference to the totality of the circumstances reasonably apparent to persons situated as were Pittman and Wilson at the time.
It may well be that David Thornhill was in effect under arrest.
Id. at 1208 (citations omitted) (emphasis added).
¶ 24. In Nash, 207 So.2d at 105, I.V. Nash was arrested in Neshoba County by the Sheriff of Scott County and one of his deputies. Nash was prosecuted and convicted for manslaughter by culpable negligence. Id. Nash appealed, and argued that the arrest was illegal, because the Sheriff of Scott County and his deputy had no authority to arrest him outside of Scott County. Id. On appeal, our supreme court stated the pertinent facts as follows:
[The sheriff and his deputy] knew that a man, while stopped off the side of the highway, had been struck and killed by a car and that the driver had not stopped. They knew they were looking for I.V. Nash, but the record does not disclose whether they knew I.V. Nash personally.
The sheriff and his deputy went to the intersection of the road leading to Nash's father's home with Highway 21 in Neshoba County. They had searched *319 about an hour before finding appellant. A car came from a little country road into Highway 21 and seemed about to come into the side road were [sic] the officers were but suddenly turned and headed north. The sheriff said "we" [sic] hollered at them and they stopped. Nash and some others were in the car. The officers told the occupants to get out because they wanted to talk to them. According to Mr. [R.D.] Simmons, [Sheriff of Scott County,] the officers asked the occupants if they knew anything about the accident. Nash spoke up and said that there was no need to hold anybody else because he was the one the officers wanted. The sheriff testified that when they stopped the car, Nash immediately started talking, saying that he was the one they were looking for and that he killed his best friend. This statement was before any arrest. There had been no charge against Nash. After Nash had made these statements, the sheriff directed him to get into the officers' car[.] Nash was then taken to his father's home, permitted to go in for a few moments, and, upon returning, was taken to Scott County.

Id. (emphasis added).
¶ 25. With respect to the issue of the illegality of Nash's arrest, the trial court held that the sheriff and his deputy were in pursuit of a fleeing offender, even though it is clear on the facts that they were not in hot pursuit because they had not seen Nash. Nevertheless, the State argued on appeal that the trial court was correct in its ruling, but if not, then the sheriff had the right to make the arrest as a private citizen. Id. at 106. In deciding the issue, the Nash court stated:
Under the facts herein shown there was probable cause to believe (1) a felony had been committed and (2) that Nash was the guilty party. We conclude on the basis of the above cited authorities that the appellant's arrest was lawful since under the facts stated a private citizen had the right to arrest.
Id. at 107 (citations omitted).
¶ 26. Of particular significance in Nash is the supreme court's finding that Nash's arrest did not occur when the Sheriff of Scott County and his deputy began their pursuit of Nash, nor did it occur at the time they stopped Nash's car. Based on the finding in Nash as to when Nash's arrest occurred, it is reasonable to conclude in our case that Delker's arrest did not occur when Chief Langston began his pursuit of him. Based on Nash, we find that Delker's arrest occurred after Chief Langston discovered that Delker had been driving under the influence as a twice-prior offender. Thornhill is significant because in it, our supreme court recognized that it is the reasonableness and totality of the circumstances surrounding the actions of a law enforcement officer that determine whether the actions taken should be deemed legal.
¶ 27. Even if we were to find that Chief Langston's arrest of Delker was unlawful, based on the United States Supreme Court's holding in Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), we would still find that evidence of Delker's driving under the influence should not be suppressed. In Herring, the Supreme Court held:
To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.
*320 Id. at 702. We do not find that Chief Langston's mistake concerning the location of the municipal limits of the town of Marion arises to the standard of conduct articulated in Herring. While Thornhill was decided before Herring, it seems that much of the reasoning applied in it is consistent with Herring.
¶ 28. We also find that Moore v. State, 986 So.2d 928 (Miss.2008) provides some guidance even, though it does not involve mistaken territorial jurisdiction. In Moore, our supreme court discussed in great detail its holding in Harrison v. State, 800 So.2d 1134 (Miss.2001), wherein two sheriff's deputies stopped a Billy Daniel Harrison Jr. "for traveling sixty-seven to seventy miles per hour in a construction zone which was marked with a sixty-mile-per-hour speed limit sign." Moore, 986 So.2d at 933(¶ 17). The Moore court noted the Harrison court's conclusion that "the deputies had sufficient probable cause to stop Harrison, even though their stopping Harrison was a mistake of law."[5]Id. at 934(¶ 19). We see no reason why Chief Langston's mistake of fact should be treated any differently from the deputy's mistake of law in Harrison.
¶ 29. For the reasons discussed, we find no merit to Delker's claim that evidence of his driving under the influence should have been suppressed.

2. Denial of Due Process During Trial Proceedings
¶ 30. Under this issue, Delker argues that he was denied due process of law because: (1) the indictment did not identify the predicate indictable offense on which the warrantless citizen's arrest was based, (2) evidence obtained under color of office was not excluded, (3) the circuit court refused to find that the arrest was the product of an unlawful search and seizure, (4) the State failed to produce the local ordinance establishing authority to make a warrantless arrest for a non-indictable offense, (5) the circuit court refused to allow full cross-examination of Chief Langston regarding Deputy Williams's administration of the standardized field sobriety tests, (6) the trial judge refused to recuse from hearing posttrial motions, and (7) the circuit court refused to permit him to introduce evidence during a posttrial motion hearing establishing that there was in fact no local ordinance, order, or resolution making it a crime to drive faster than the posted speed limit sign of thirty-five miles per hour.
¶ 31. It is obvious that most of these issues are subsumed in the larger issue of whether evidence of Delker's driving under the influence should have been suppressed because of his alleged illegal arrest. As we have already found that the evidence was legally admitted, we see no need to address this issue any further. As to the other issues, we have thoroughly considered them and find them to be without merit. However, we will briefly address one issue urged by Delker: whether the trial judge should have recused from hearing posttrial motions.
*321 ¶ 32. The basis of the posttrial motion for recusal was that on the morning of the first day of the trial, counsel for Delker sought to have additional motions heard, and the trial judge responded, "G--- d--- it Robert, I am tired of hearing your motions." We first note that notwithstanding the statement, the trial judge delayed the start of the trial and heard the motions. During the hearing on the posttrial motion to recuse, the trial judge offered the following:
I don't dispute what was said. A little bit more in detail, back on July  well, first of all, in the document entitled "Waiver of Arraignment and Entry of Plea on Non-capital Cases" this language is in the document: That all motions are to be filed, notified and heard on or before 10 days prior to trial date. And then, Mr. Delker started with, I think, Pat Jordan, an attorney, then he went to Henry Palmer and Robbie Jones. They had a conflict and then you got in. Long story short, on our order resetting the hearing, dated July 23, 2007, we continued the trial until September 17th of '07, for the reason  and the reason that case was continued was to allow motions to be heard. Then on September 6th, we did hear-you had filed a number of motions, and we heard the Motion to Suppress. I had all afternoon to hear those motions. We heard it for two hours. And then at the conclusion of that motion, I asked you, do you want to call up any of the other motions? And you said no. Well, I considered all motions [as] being waived. Then the morning of the trial, I had to qualify the jury. It's pretty convoluted downstairs. Then, we were going to have to start our trial. I walked out to qualify the jury and you said you need to hear some more motions you had filed the day of trial, and it irritated me. And what you said in your motion is exactly accurate. I apologize for saying that, but it just hit me wrong. But for the record, I qualified the jury. Instead of starting the trial, dismissed the jury until 1:30, we went upstairs and heard motions. Is that accurate?
BY MR. ROBERT COMPTON: I think we heard them in chambers, Your Honor, but 
BY THE COURT: Well, we heard your motions.
BY MR. ROBERT COMPTON: That is an accurate statement, Your Honor.
¶ 33. We certainly do not condone the trial judge's conduct. But we cannot find reversible error in the trial judge's refusal to recuse. In this regard, we note that had Delker believed that the trial judge could not be fair and impartial, surely he would have sought the judge's recusal after the statement was made, rather than waiting until after the trial was over. In any event, we have carefully reviewed the various rulings made by the trial judge during the course of the trial proceedings, and we have seen nothing that would suggest that Delker was denied due process by any of the judge's rulings. Therefore, we find that this issue is without merit.
¶ 34. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE AND SENTENCE, AS A HABITUAL OFFENDER, OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., AND CARLTON, J., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE *322 WRITTEN OPINION. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., GRIFFIS AND ISHEE, JJ., AND JOINED IN PART BY BARNES, J.
ROBERTS, J., Dissenting.
¶ 35. This case requires a close examination of the extent of a municipal law enforcement officer's authority to pursue and arrest a citizen outside of his territorial jurisdiction without acting in hot pursuit for a violation that did not occur in that officer's jurisdiction. I would conclude that, based on controlling precedent, a law enforcement officer possesses the same authority a private citizen possesses to make a citizen's arrest. Because private citizens are not statutorily authorized to arrest other private citizens for violations of county ordinances when no breach of the peace occurs or is threatened, I would find that James Robert Delker's arrest was unauthorized. Because evidence seized as a result of an unlawful arrest is not admissible, I would reverse Delker's conviction and render a judgment of acquittal. Accordingly, I cannot concur with the majority's decision to affirm the judgment of the circuit court. I respectfully dissent.
¶ 36. The underlying facts of this case are undisputed. Ben Langston, the Chief of Police for the Town of Marion, Mississippi, was on duty the night of Christmas Eve 2005.[6] At approximately 11:00 p.m., Chief Langston was in his patrol car at the entrance of the Valley Ridge Apartments on the south side of Old Country Club Road. Old Country Club Road runs east to west and was, therefore, perpendicular to Chief Langston's position at the time. As long as Chief Langston remained in the apartment parking lot, he was in his jurisdiction. Old Country Club Road was not in Chief Langston's jurisdiction, although he mistakenly believed that it was.[7]
¶ 37. As Chief Langston was on his way out of the parking lot, Delker drove his car east down Old Country Club Road. Chief Langston's patrol car was not equipped with radar, but based on his training, Chief Langston believed that Delker was driving approximately forty-five miles per hour.[8] The posted speed limit on Old Country Club Road was thirty-five miles per hour. Chief Langston never saw Delker within the territorial jurisdictional boundaries of the Town of Marion. Chief Langston pulled onto the street, out of his jurisdiction, and pursued Delker. Chief Langston turned on his flashing lights, but Delker did not stop. Chief Langston used his radio to call dispatch to request assistance from the Lauderdale County Sheriff's Department.
¶ 38. Delker continued east on Old Country Club Road for a short distance. Chief Langston later testified that he "paced" Delker's car and that, during the pursuit, Delker's car reached speeds as high as approximately sixty-five miles per hour. Approximately 700 yards east of the entrance to the apartments, Old Country Club Road intersects with Lizelia Road. Delker did not stop at the one-way stop at *323 the Lizelia Road intersection. Instead, he went around a car stopped at the one-way stop sign, did not stop at all, and proceeded north on Lizelia Road. A short distance north of that intersection, Lizelia Road forks to the right. The left fork turns into Van Zyverden Road. Delker took the left fork onto Van Zyverden Road and continued driving a short distance until he turned left into the driveway of his home. The total distance from the apartment parking lot to Delker's home is approximately eight-tenths of a mile.
¶ 39. Chief Langston followed Delker into his driveway. Chief Langston later testified that he smelled alcohol emanating from Delker's car. Chief Langston had Delker get out of his car. Delker reportedly had trouble getting out of the car. Chief Langston testified that Delker also had some difficulty standing and that his speech was slurred. Chief Langston approached Delker and asked him why he did not stop. According to Chief Langston, Delker replied, that he "knew he was going to go to jail, and he didn't want to leave his car along side the roadway." Chief Langston handcuffed Delker and placed him in custody in the back of his patrol car.
¶ 40. As previously mentioned, during the short pursuit, Chief Langston had radioed for assistance from the Lauderdale County Sheriff's Department. Approximately five minutes after Chief Langston first confronted Delker, Deputy Karey Williams arrived. According to Chief Langston's testimony, when Deputy Williams arrived at Delker's house, Delker was in the back seat of Chief Langston's patrol car. However, Deputy Williams testified that Delker was handcuffed, but Delker was not in Chief Langston's patrol car when he arrived at the scene. In any event, Deputy Williams transported Delker to the Lauderdale County Jail and administered a field sobriety test, aspects of which Delker reportedly failed. Deputy Williams asked Delker to blow into the Intoxilyzer 8000 machine. Delker declined to do so. On January 3, 2006, Deputy Williams formally charged Delker for felony driving under the influence of alcohol and driving with a suspended driver's license. That same date, Chief Langston charged Delker with reckless driving. The evidence obtained due to Chief Langston's stop and his arrest  as characterized by the circuit court  included: (1) a beer can found in Delker's car; (2) a partially empty whiskey bottle also found in Delker's car; (3) personal observations of Delker's behavior, including swaying, compromised balance, slurred speech, and lack of fine motor control; (4) an odor of alcohol; (5) Delker's refusal to take a portable breathalyzer test; (6) Delker's field sobriety test; and (7) Delker's refusal to blow into the Intoxilyzer 8000 machine.
¶ 41. Delker filed a pretrial motion in limine to suppress evidence seized as a result of Chief Langston's stop. Delker argued that Chief Langston had no authority to stop or arrest him because he never committed any offense in Chief Langston's jurisdiction. The circuit court found no merit to Delker's argument. Instead, the circuit court found that Chief Langston acted as a private citizen and that Chief Langston had the authority to effectuate a citizen's arrest under the circumstances. The circuit court's decision was not based on the concept that Chief Langston acted in good faith.[9] Delker claims the circuit *324 court erred. The majority finds no merit to Delker's argument. I respectfully disagree.
¶ 42. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18(¶ 21) (Miss.2006). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment." Id. The circuit court found that Chief Langston had the right to stop Delker from the moment he saw Delker speeding, and that Chief Langston actually effectuated Delker's arrest. That is, the circuit court never found that Deputy Williams arrested Delker. The circuit court's decision in that regard is not on appeal. Accordingly, any analysis on appeal must be from that perspective.
¶ 43. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). The Mississippi Supreme Court has stated that it "is committed to the rule that an arrest begins when the pursuit to make the arrest begins." Pollard v. State, 233 So.2d 792, 793 (Miss.1970). Furthermore:
If an officer does not have the authority to make an arrest at the instant he begins his pursuit for the purpose of making the arrest, the fact that the person the officer is pursuing violates the traffic law in making his escape does not thereby authorize the arrest that began unlawfully, because an officer who attempts an unlawful arrest cannot later arrest a citizen for resisting such trespass.
Id. (quoting Smith v. State, 240 Miss. 738, 744, 128 So.2d 857, 859-60 (1961)).
¶ 44. However, the circuit court found that Chief Langston could have only acted as a private citizen because Chief Langston was out of his jurisdiction, and he was not in hot pursuit of Delker due to some violation that originally occurred in Chief Langston's jurisdiction.[10] It is undisputed *325 that Delker was never in Chief Langston's jurisdiction, so Chief Langston could not have been engaged in fresh pursuit of Delker for some violation that occurred within the Town of Marion.[11] During the hearing on Delker's motion to suppress, Delker's attorney played the videotape of events captured by Deputy Williams's dashboard camera while Chief Langston and Deputy Williams were at Delker's house on Christmas Eve 2005. Chief Langston testified that he was not able to hear a particular exchange that took place between himself and Deputy Williams. The following exchange then transpired between Chief Langston and Delker's attorney:
[Delker's attorney]. Didn't [Deputy] Williams question you about why weren't you handling this case, and you told him it was better for him to handle it because it was outside your jurisdiction?
[Chief Langston]. I don't remember that. I couldn't make it. It was close to time for me to go home. I don't remember it.
[Delker's attorney]. What I want you to be clear on, and so the record will properly reflect it, did you tell [Deputy Williams] that you  that it would be better for him to handle it because it was outside your jurisdiction, or you don't recall making that statement?
[Chief Langston]. I don't recall telling him that.
[Delker's attorney]. And again, for purposes of clarity, are you saying that you did not tell him that or you don't recall saying that?
[Chief Langston]. I don't remember telling him. I don't remember telling him that.
Accordingly, Chief Langston did not deny that he told Deputy Williams that he was aware he was outside of his jurisdiction. Instead, Chief Langston testified that he could not remember whether he admitted to Deputy Williams that he was outside of his jurisdiction.
¶ 45. The State, in its brief, argues exclusively that Chief Langston's pursuit, arrest, and seizure of Delker was justified as an arrest by a private citizen. The State took the same position during oral arguments before this Court. In fact, the State specifically stated that it was "beholden" to the circuit court's resolution that Chief Langston acted with the authority of a private citizen. The circuit court never based its decision on the concept that *326 Chief Langston acted with the good-faith, but mistaken, belief of a law enforcement officer. The State does not now and has never taken the position that Chief Langston's actions were those of a law enforcement officer acting in good faith but with the mistaken belief that Old Country Club Road was within his territorial jurisdiction. It is just as well because the Mississippi Supreme Court has held that "[a]n officer who seeks to make an arrest without [a] warrant outside his territory must be treated as a private person. Of course, his action will be lawful if the circumstances are such as would authorize a private person to make the arrest." Nash v. State, 207 So.2d 104, 106 (Miss.1968) (quoting 5 Am.Jur.2d Arrests § 50 (1962)).
¶ 46. The issue that arises is when may a private citizen make an arrest? The law in Mississippi is clear that "[p]rivate persons may . . . make arrests." Miss.Code Ann. § 99-3-1(1) (Rev.2007). Pursuant to Mississippi Code Annotated section 99-3-7(1) (Rev.2007), a private citizen may only arrest another citizen under the following circumstances:
for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested.
There was no breach of the peace. Chief Langston suspected that Delker was speeding on a road that was not within Chief Langston's jurisdiction. "A `simple traffic violation' does not constitute a breach of the peace." Atwell, 470 F.Supp.2d at 565 (citing Horn v. City of Seat Pleasant, Md., 57 F.Supp.2d 219, 226 (D.Md.1999) (holding that an officer did not have authority to arrest someone for driving 75 mph in a 55 mph where the suspect was driving on a road that was outside the officer's jurisdiction.)) When Chief Langston began to pursue Delker, no felony had been committed, and Chief Langston had no reason at that time to conclude that Delker was committing a felony. The only valid circumstance under which Chief Langston, then judged as a private citizen, could have arrested Delker is if Delker had committed an "indictable offense."
¶ 47. "The word `indictable' . . . means such offenses as a grand jury may indict for, and does not include municipal ordinances." Letow v. U.S. Fid. & Guar. Co., 120 Miss. 763, 768, 83 So. 81, 82 (1919). When Chief Langston first encountered Delker, Chief Langston suspected that Delker was speeding on a county road.[12] *327 Mississippi Code Annotated section 63-3-511 (Rev.2004) provides, in part, as follows:
Whenever local authorities, including boards of supervisors, within their respective jurisdictions, determine upon the basis of an engineering and traffic investigation that the speed permitted under this article [i.e., 55 miles per hour] on any . . . county road . . . is greater than is reasonable or safe under conditions found to exist upon such . . . county road . . ., such local authorities shall determine and declare by ordinance, a reasonable and safe speed limit. . . .
Accordingly, violations of municipal or county ordinances are not indictable offenses. They are not violations "against the peace and dignity of the [s]tate." Miss. Const. art. 6, § 169. It follows that, under the circumstances, Chief Langston, acting as a private citizen, could not have effectuated a lawful and valid citizen's arrest of Delker.
¶ 48. Although Chief Langston testified that he did not intend to arrest Delker for speeding and that Deputy Williams actually arrested Delker, the circuit court found that Chief Langston had "the authority, as a private citizen, to effectuate the arrest of [Delker] for the misdemeanor offense of speeding." The circuit court also found that "the arrest of [Delker] was proper." The circuit court never found that Deputy Williams arrested Delker. Because Delker has not appealed those findings and the State has not cross-appealed, the circuit court's findings in that regard are not at issue. There is factual support for the circuit court's decision, as Chief Langston handcuffed Delker and confined Delker in the back of his patrol car, where Delker was not free to leave until a deputy could arrive. Additionally, as previously mentioned, "an arrest begins when the pursuit to make the arrest begins." Pollard, 233 So.2d at 793.
¶ 49. Based on the foregoing analysis, I must conclude that Chief Langston, acting with only the authority of a private citizen, had no authority to stop Delker for speeding on a county road outside of his jurisdiction. Because Chief Langston's initial purpose was impermissible, Delker's subsequent traffic violations did not cure Chief Langston's unlawful arrest. Accordingly, Delker was seized in violation of his right to be free from unreasonable seizures, and all the evidence obtained as a result of the unreasonable seizure is inadmissible, including Deputy Williams's field sobriety test that led to Delker's conviction. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court").
¶ 50. The majority states that the proper resolution of this case involves two "very relevant" matters: "the time of Delker's arrest and the offense(s) that he had committed at that time." The majority concludes that, despite the precedential dictates that an arrest begins when a law enforcement officer initiates a pursuit, Chief Langston only arrested Delker when Delker got out of his car. Respectfully, the majority does not cite any authority which would allow a private citizen to pursue and stop another private citizen for the purpose of issuing a warning. The majority does not suggest that a private citizen has the right to stop another private citizen for speeding or any other violations of county or municipal ordinances. Furthermore, neither this opinion nor the majority opinion cites any authority that stands for *328 the proposition that an otherwise impermissible pursuit by a private citizen becomes permissible when another private citizen refuses to stop for an otherwise illegal pursuit. Consequently, Chief Langston, acting only with the authority of a private citizen, had no legal authority to attempt to stop Delker to issue a warning. Similarly, Chief Langston, acting only with the authority of a private citizen, could not justify his continued pursuit on Delker's failure to stop. Further, the concept that Chief Langston's initial pursuit of Delker somehow is validated based on Chief Langston's subjective intent to only issue a warning to Delker must be rejected. As previously stated, the supreme court has held as follows:
If an officer does not have the authority to make an arrest at the instant he begins his pursuit for the purpose of making the arrest, the fact that the person the officer is pursuing violates the traffic law in making his escape does not thereby authorize the arrest that began unlawfully, because an officer who attempts an unlawful arrest cannot later arrest a citizen for resisting such trespass.
Pollard, 233 So.2d at 793.
¶ 51. The majority then addresses what it considers to be the second relevant matter. According to the majority, that matter involves "the offense(s) that [Delker] had committed at the time of his arrest." The majority concludes that the answer is "clear" and "not debatable" that Delker "had committed the crime of felony DUI." I respectfully disagree. Chief Langston had a previous encounter with Delker shortly before the events that transpired on December 24, 2005. Chief Langston testified that, on an unspecified date in November 2005, he had arrested and transported Delker to the Lauderdale County Jail "[t]o have him blow in the intoxilyzer for possible DUI." Although Chief Langston suspected that Delker was driving under the influence, Delker blew into the intoxilyzer machine, and "he did not go over the limit." When Delker's attorney asked Chief Langston to clarify that Delker "wasn't driving under the influence on that occasion," Chief Langston responded, "[o]f alcohol, no, sir." Apparently, Chief Langston believed that, on that previous occasion, Delker was under the influence of something other than alcohol. However, there was no evidence to support Chief Langston's assumption. Be that as it may, Chief Langston testified unequivocally that on Christmas Eve 2005, he did not know that Delker was operating the car until Delker arrived at his home and got out of the car.[13] Chief Langston *329 never testified that, at the time he realized that it was Delker who had been driving the car, he knew Delker had been, within five years of that time, twice convicted of driving under the influence. Chief Langston was, however, aware that Delker was driving without a driver's license. Chief Langston stated that he turned Delker over to Deputy Williams for processing. There simply is no basis whatsoever in the record to find that, at the time Chief Langston placed Delker in custody, he had probable cause and reasonable grounds to conclude that Delker had committed a felony DUI offense. It was only after Deputy Williams concluded that Delker, in fact, had two prior convictions for driving under the influence within five years of the Christmas Eve 2005 incident that Delker was charged with felony driving under the influence, and that occurred ten days later on January 3, 2006. Accordingly, while we who are afforded with hindsight now know that Delker was engaged in felony driving under the influence on December 24, 2005, and while they might have suspected that Delker was under the influence, neither Chief Langston nor Deputy Williams had the benefit of knowing that it was a felony offense at that time.
¶ 52. As previously mentioned, when Chief Langston contacted the Lauderdale County Sheriff's Department, he was not aware that Delker was driving under the influence. Additionally, he was not aware that Delker had two prior convictions for driving under the influence. Finally, he was not aware that Delker's two prior convictions for driving under the influence occurred within five years of December 24, 2005. Just because Chief Langston  completely outside of his jurisdiction  contacts the appropriate law enforcement agency responsible for that jurisdiction  he does not somehow gain authority he previously did not have by virtue of information that he did not know. The majority seems to conclude that the result, albeit illegal, justifies the means. The facts cannot be changed. When Chief Langston began his pursuit and made his arrest, he was acting in his capacity as a Marion police officer. He used his marked police cruiser, flashing lights, siren, uniform, handcuffs, law-enforcement radio, and other assets to effectuate the arrest. It is only his authority to use such tools outside his jurisdiction that is under analysis.
¶ 53. The majority interprets section 99-3-7(1) to mean that a private citizen may arrest another private citizen without any knowledge or even a reason to suspect that the arrested private citizen committed a felony or an indictable offense. In other words, the majority finds that it is not what a private citizen knows or suspects that justifies the arrest, but rather what the private citizen later discovers after the arrest. The Mississippi Supreme Court has interpreted the predecessor to the present statute differently. According to our supreme court, the predecessor to section 99-3-7(1), section 1227 of the 1930 Mississippi Code, which was worded identically to the present statute, "authorizes among other things a private person to arrest without a warrant a person who has committed a felony, though not in his presence. There must be probable cause however to believe that a felony has been committed, and that the person arrested is the guilty one." Howell v. Viener, 179 Miss. 872, 879-80, 176 So. 731, 733 (1937). Presently, section 99-3-7(1) states that "in all cases of arrests without a warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested *330 on pursuit." Chief Langston did not know that Delker was driving under the influence when he attempted to stop him. I cannot concur with a finding that an arrest is justified based solely on what the person making the arrest later discovers as the fruit of what would otherwise be an unlawful arrest. It bears considering that the majority's interpretation could also be extended to law enforcement officers, because section 99-3-7(1) applies to "[a]n officer or private person." That is, section 99-3-7(1) does not distinguish between a private citizen's authority to make arrests as opposed to a law enforcement officer's authority to make arrests.
¶ 54. Pursuant to the majority's rationale, law enforcement agencies within a jurisdiction could simply call on non-jurisdictional agencies to do that which a jurisdictional agency could not do. That is, assume sheriff's deputies in Hinds County, Mississippi wanted to obtain evidence or seize a person but it would be illegal to do so under the circumstances. According to the majority, those deputies would need only to contact officers with the Jackson Police Department to come outside the Jackson city limits to do that which the deputies could not, because pursuant to the majority's rationale, those officers would be private citizens and their improper search or seizure would not be subject to the exclusionary rule.
¶ 55. Chief Langston does not "become" a private citizen because he attempted to stop Delker outside of his jurisdiction. As the Mississippi Supreme Court held in Nash, 207 So.2d at 106, "[a]n officer who seeks to make an arrest without warrant outside his territory must be treated as a private person." Nash did not hold that the officer becomes a private citizen. Instead, the officer is merely treated as a private citizen. Nash made this imminently clear by stating that the actions of an officer who acts outside his jurisdiction "will be lawful if the circumstances are such as would authorize a private person to make the arrest." Id. Rather, such an officer's actions are legal if a private citizen could do what Chief Langston did. In the context of the application of the exclusionary rule, the natural extension of the relevant holding in Nash is that any evidence obtained by Chief Langston while acting outside of his jurisdiction is only admissible if a private citizen could have obtained that evidence. In other words, Chief Langston does not become exempt from the exclusionary rule just because he acts within the color of his office outside of his jurisdiction. Such a conclusion defies logic and, contrary to the Supreme Court's decision in Mapp, removes all incentive for law enforcement agencies to conduct themselves within the boundaries of the constitutions.
¶ 56. Assuming for the sake of argument that Chief Langston somehow transformed from an on-duty police officer to a private citizen once he left the boundaries of his jurisdiction, under the circumstances of this case, the evidence he obtained is still subject to the exclusionary rule. "There is no question that `a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and such private wrongdoing does not deprive the government the right to use the evidence.'" United States v. Kirk, 392 F.Supp.2d 760, 764 (N.D.Miss.2005) (quoting United States v. Jenkins, 46 F.3d 447, 460 (5th Cir.1995)). "However, if a private citizen acts as a government agent or instrument, then that citizen violates the Fourth Amendment by engaging in an unlawful search." Id. at 765 (citing United States v. Bazan, 807 F.2d 1200, 1202 (5th Cir.1986)).
¶ 57. There is a two-pronged test to determine whether a private citizen has *331 acted as a government agent in this context: "(1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement or to further his own ends." Id. (citing United States v. Miller, 688 F.2d 652, 657 (9th Cir.1982)). "De minimis or incidental contacts between the citizen and law enforcement agents . . . will not be subject to Fourth Amendment scrutiny." Id. "The government must be an active participant or an encourager of the private citizen's actions for the citizen to become an instrument of the state." Id.
¶ 58. No exercise in semantics can characterize Chief Langston's contact with Delker as "de minimis" or "incidental." Chief Langston purposefully initiated an attempted traffic stop outside of his jurisdiction. When he did so, he intended to act within the authority of his office as a governmental law enforcement officer. He claims he mistakenly believed that he was inside his jurisdiction. In that sense, the government most certainly knew of Chief Langston's conduct because Chief Langston intended to act in his capacity as an agent of the government. Chief Langston never intended to act as a private citizen. He was on-duty. He was in his uniform and his patrol car. A municipal police officer's "official uniform and weapon may be worn and utilized only at locations which are within the jurisdiction of the governmental entity whose uniform and weapon are involved." Miss.Code Ann. § 17-25-11(5) (Supp.2008). Chief Langston used his flashing blue lights to attempt to stop Delker. "Only police vehicles used for emergency work may be marked with blinking, oscillating or rotating blue lights to warn other vehicles to yield the right-of-way." Miss.Code Ann. § 63-7-19(1) (Supp.2008). "It is unlawful for any person, other than a law enforcement officer on duty, to use or display blue lights on a motor vehicle." Miss.Code Ann. § 63-7-20(1) (Rev.2004). Chief Langston used the radio provided to him by the government to request assistance from other government agents. In other words, Chief Langston used all the tools that were available to him as a law enforcement officer. Not only did Chief Langston intend to assist law enforcement  he intended to act as law enforcement. Accordingly, even if one concludes that Chief Langston transformed into a private citizen when he pulled out onto Old Country Club Road, pursuant to the two-pronged test to determine whether a person acted as a government agent, no reasonable person could conclude that Chief Langston was not a government agent. Consequently, any evidence he obtained is subject to the exclusionary rule-which would apply to not just the Marion Police Department, but also the Lauderdale County Sheriff's Department. See e.g., Atwell, 470 F.Supp.2d at 567 (citing State v. Phoenix, 428 So.2d 262, 266 (Fl.Dist.Ct. App.1982) (holding that a police officer acting outside of his or her jurisdiction may not utilize the power of his office to gather evidence not otherwise obtainable)).
¶ 59. It is necessary to elaborate on what is termed the "good-faith" exception to the exclusionary rule. First and foremost, the majority cites no authority by which the good-faith exception to the exclusionary rule applies to private citizens. In any event, the United States Supreme Court discussed the good-faith exception to the exclusionary rule in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Jurisdiction was not a question in that case. Rather, a police officer observed a defendant driving the wrong way down a one-way street. Id. at 4, 115 S.Ct. 1185. The officer stopped the defendant and asked to see his driver's license. Id. The defendant informed the *332 officer that his driver's license had been suspended. Id. As a consequence, the officer entered the defendant's name into a computer located in the officer's patrol car. Id. The computer inquiry indicated that there was an outstanding warrant for the defendant's arrest. Id. The officer arrested the defendant who, while being handcuffed, dropped a marijuana cigarette. Id. When officers searched the defendant's car, they found a bag of marijuana under one of the defendant's car seats. Id. It was later determined that the warrant for the defendant's arrest had been quashed seventeen days before the officer arrested the defendant. Id. The defendant sought to suppress the evidence seized as a result of the officer's arrest. Id. The Supreme Court held that the good-faith exception to the exclusionary rule applied. According to the Supreme Court, "[w]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that. . . the officer is acting as a reasonable officer would and should act in similar circumstances." Id. at 11-12, 115 S.Ct. 1185 (citation and internal quotations omitted). "Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." Id. at 12, 115 S.Ct. 1185. The Supreme Court went on to hold that there was "no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed." Id. at 15, 115 S.Ct. 1185. There is absolutely no evidence that a reasonable officer would be unaware of his jurisdictional boundaries, or that he would stop and arrest individuals for offenses that occurred outside of his jurisdiction. There was no evidence that Chief Langston received erroneous advice from anyone as to the location of the boundaries of his jurisdiction. In fact, Chief Langston never explained the source of his mistaken belief as to the limits of his jurisdiction. It appears that he simply assumed, without any articulable basis, that Old Country Club Road was within his jurisdiction. As previously mentioned, the only evidence of any inquiry regarding whether Old Country Club Road was within Chief Langston's jurisdiction occurred shortly before the hearing on Delker's motion to suppress, when-upon Chief Langston's inquiry-a country road crew correctly informed the Marion Chief of Police that Old Country Club Road was not within his jurisdiction. In this case, excluding the evidence at issue would not make Chief Langston less willing to perform his duties. Instead, applying the exclusionary rule would encourage him to be aware of the boundaries of his jurisdiction and make him less likely to undertake non-jurisdictional stops or arrests of individuals who did not commit an offense within his jurisdiction.
¶ 60. We have previously affirmed a trial court if the trial court reached the right result for the wrong reason. See Towner v. State, 837 So.2d 221, 225(¶ 9) (Miss.Ct.App.2003). In my opinion, we cannot do so in this case for two reasons. First and foremost, the circuit court did not find as a fact that Chief Langston had a good-faith-but-mistaken belief that Delker was within Chief Langston's jurisdiction when Chief Langston encountered Delker. Neither the district attorney at trial, the circuit court, nor the attorney general relied on that argument. To make that argument for the State in this instance would require that this Court act as an advocate, rather than an impartial arbiter of disputes. Second, such a conclusion by us would constitute fact-finding, and our mandate requires that we can only review a *333 trial court's factual findings because we are not fact-finders.
¶ 61. Recently, the Mississippi Supreme Court reversed this Court in our determination that a post-conviction-relief petitioner was entitled to an evidentiary hearing on his claim of constitutionally deficient trial counsel. Moore v. State, 986 So.2d 928, 937(¶ 30) (Miss.2008). The petitioner claimed that a law enforcement officer stopped him solely because the petitioner's vehicle had just one working tail light. Id. at 929(¶ 2). Later research of the motor vehicle statutes reflected that, pursuant to Mississippi law, only one working tail light is required. Miss.Code Ann. § 63-7-13 (Rev.2004). The Mississippi Supreme Court stated, "[f]rom the totality of the record before us, we conclude that [the officer] had an objective, reasonable basis for believing that [Frederick] Moore was in violation of the law for driving a vehicle on a public street with only one operative tail light." Id. at 935(¶ 21). In other words, the supreme court held that the officer's objective belief that the petitioner had committed a traffic violation sufficed as justification for the officer's traffic stop.
¶ 62. In this case, the evidence revealed that an approximate one-mile section of the southern right-of-way of Old Country Club Road served as the entire northern boundary of the Town of Marion. Chief Langston, a fourteen-year seasoned law enforcement veteran, had been patrolling within the Town of Marion for more than eight years. As previously discussed, there is absolutely no evidence that: (1) a reasonable officer would be unaware of his jurisdictional boundaries; (2) a reasonable officer would stop and arrest individuals for offenses that occurred outside of his jurisdiction; or (3) Chief Langston received erroneous advice from anyone as to the location of the boundaries of his jurisdiction. Chief Langston never explained the source of his mistaken belief as to the limits of his jurisdiction. The record supports just one conclusion  Chief Langston merely assumed, without any articulable basis, that Old Country Club Road was within his jurisdiction. Chief Langston's assumption may well have been objectively unreasonable and less than candid.
¶ 63. "[T]he purpose of the exclusionary rule `is to deter-to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it.'" Mapp, 367 U.S. at 656, 81 S.Ct. 1684 (quoting Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). Prior to the United States Supreme Court's decision in Mapp, only federal prosecutors were subject to the exclusionary rule, while it was left to each state to determine whether its prosecutors were likewise subject to the exclusionary rule. Id. at 657, 81 S.Ct. 1684 ("Presently, a federal prosecutor may make no use of evidence illegally seized, but a State's attorney across the street may, although he supposedly is operating under the enforceable prohibitions of the same Amendment."). The Supreme Court noted that "[i]n non-exclusionary States, federal officers, being human, were by it invited to and did, as our cases indicate, step across the street to the State's attorney with their unconstitutionally seized evidence." Id. at 658, 81 S.Ct. 1684. However, the Supreme Court held that the exclusionary rule applied to each state, regardless whether that state had adopted the exclusionary rule on its own. Id. at 655, 81 S.Ct. 1684. The same rationale applies to the concurrent jurisdiction that the Lauderdale County Sheriff's Department has along with the Marion Police Department. To hold that one law enforcement agency may use evidence that another law enforcement agency is prohibited from using would be contrary to the Supreme Court's decision in Mapp, and it *334 would eviscerate the purpose of the exclusionary rule  to deter the incentive to ignore constitutional guarantees. The main purpose of the exclusionary rule is to deter future police misconduct. Evans, 514 U.S. at 10, 115 S.Ct. 1185. Exclusion of evidence under the circumstances "serves the purpose of encouraging law enforcement officers to know the bounds of their authority." United States v. Simon, 368 F.Supp.2d 73, 79 (D.D.C.2005).
¶ 64. In Mapp, the United States Supreme Court addressed the concern that some criminals would go free due to errors by law enforcement officers. Mapp, 367 U.S. at 659, 81 S.Ct. 1684. The Supreme Court concluded that "[i]n some cases this will undoubtedly be the result." Id. However, the Supreme Court recognized that "there is another consideration-the imperative of judicial integrity." Id. (quoting Elkins, 364 U.S. at 222, 80 S.Ct. 1437). The Supreme Court went on to state as follows:
The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. . . . Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.
Id. (internal quotations and citations omitted). In its wisdom, the Supreme Court recognized that its decision in Mapp "gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." Id. at 660, 81 S.Ct. 1684.
¶ 65. The Double Jeopardy Clause of the United States Constitution precludes a second trial when an appellate court has found the evidence against a defendant to be legally insufficient. Burks v. United States, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). "[T]he only `just' remedy available is . . . the direction of a judgment of acquittal." Id. Having found that the evidence obtained from Delker should have been suppressed, I must conclude that there is no remaining incriminating evidence sufficient to support a conviction of Delker. A complete lack of evidence is undoubtedly insufficient evidence. Consequently, I would find that it is inappropriate to reverse and remand for a new trial. "[T]he prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." Id. at 16, 98 S.Ct. 2141. The Mississippi Supreme Court has directed that when, as a result of the suppression of evidence obtained illegally, the evidence against the accused cannot sustain a conviction, the proper remedy is to reverse and render. White v. State, 735 So.2d 221, 224 (¶¶ 10-11) (Miss.1999). I would follow the direction of the Mississippi Supreme Court, reverse Delker's conviction, render a judgment of acquittal, and order Delker discharged.
KING, C.J., GRIFFIS AND ISHEE, JJ., JOIN THIS OPINION. BARNES, J., JOINS THIS OPINION IN PART.
NOTES
[1] Section 99-19-81 provides:

Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
Interestingly, the two predicative felony offenses giving rise to Delker's habitual offender status were felony DUIs committed in 1998 in Lauderdale County. Therefore, Delker has been convicted at least five times of driving under the influence, including the felony DUI conviction which is the subject of this appeal.
[2] Chief Langston did not learn until two or three weeks prior to trial that Old Country Club Road was not within the corporate limits of the town of Marion.
[3] Prior to arresting Delker, Chief Langston observed an empty beer can on the front seat of Delker's car. Later, upon a closer examination of the car, a nearly-empty whiskey bottle was found on the back floorboard.
[4] See, e.g., Pollard, 233 So.2d at 793; Smith v. State, 240 Miss. 738, 743-44, 128 So.2d 857, 859-60 (1961). See also Ford v. City of Jackson, 153 Miss. 616, 121 So. 278, 279 (1929) (holding that an officer must have probable cause to search when the pursuit to conduct the search begins).
[5] The Harrison court found that "Harrison had not violated the construction-zone speed limit (since construction workers were not present) or the general seventy-mile-per-hour speed limit, and that it thus necessarily followed `that evidence derived from the stop would be subject to suppression if the inquiry stopped there.'" Moore, 986 So.2d at 934(¶ 19) (citing Harrison, 800 So.2d at 1138-39). Of course, the inquiry did not end there. The Harrison court went on to affirm Harrison's conviction for possession of a controlled substance, finding that "[b]ased on the totality of circumstances and the valid reasonable belief that Harrison was violating the traffic laws, the two deputies had probable cause to stop Harrison, even though it was based on a mistake of law." Harrison, 800 So.2d at 1139(¶ 21).
[6] The Town of Marion is a small incorporated municipality located adjacent to the City of Meridian in Lauderdale County, Mississippi. According to the 2000 federal census, Marion had a population of 1,305 residents.
[7] Old Country Club Road (the rights of way on each side as well as the pavement itself) is in Lauderdale County, but it is not within the Town of Marion. Consequently, the Lauderdale County Sheriff's Department is responsible for enforcing the law on Old Country Club Road.
[8] Because Marion does not have more than 2,000 residents, its small police department was not authorized to use radar speed detection equipment. Miss.Code Ann. § 63-3-519(1) (Rev.2004).
[9] It is possible that the circuit court did not resolve the issue based on a good-faith analysis because to do so would carry the possibility that, had the circuit court declined to believe that Chief Langston acted in good faith, it would be necessary to consider whether Chief Langston committed perjury when he said he believed he was within his territorial jurisdiction.
[10] The record reflects that, as of the date of the hearing on Delker's motion to suppress, Chief Langston had been a law enforcement officer for approximately fourteen years. In July 1997, Chief Langston began working for the Marion Police Department. In July 2005, Chief Langston began working in his capacity as the chief of police. I can think of no municipal employee more chargeable with knowledge of the actual location of his municipal boundaries than the chief of police. However, Chief Langston testified that the first knowledge he had of the exact location of the northern boundary of the Town of Marion was two or three weeks before Delker's trial when he talked with members of a Lauderdale County road maintenance crew who were working on Old Country Club Road. That road maintenance crew informed Chief Langston that Old Country Club Road was not within the municipal boundaries of Marion. Photographs of the two signs announcing entry into the northernmost Marion municipal boundary were introduced into evidence. Both of those signs are south of Old Country Club Road. The circuit court took judicial notice that, pursuant to the decree establishing the boundaries of the Town of Marion, "the south right-of-way line of . . . [Old] Country Club Road, was the northeastern boundary line of the Town of Marion." Delker's attorney also submitted the affidavit of Terrell Temple, "the Lauderdale County consulting civil engineer," who stated that Old Country Club Road was outside of the municipal boundaries of the Town of Marion. Accordingly, it is entirely undisputed that Delker was never within Chief Langston's jurisdiction. Regardless of whether Chief Langston's claim of ignorance of the location of the Marion municipal boundaries was reasonable, the circuit court never found that Chief Langston had a good-faith but erroneous belief that Delker was within Chief Langston's jurisdiction when Chief Langston encountered Delker.
[11] In United States v. Atwell, 470 F.Supp.2d 554 (D.Md.2007), the Maryland United States District Court reviewed the lawfulness of an arrest by a military police (MP) officer for violations that occurred within the MP's jurisdiction while the actual stop and arrest occurred outside the MP's jurisdiction. The Maryland District Court found that the MP's stop and arrest were lawful, in part, because a traffic offense occurred within the MP's jurisdiction. Id. at 571. The Maryland District Court when on to hold that it was reasonable for the MP to stop the defendant in Atwell because the MP "formed his reasonable articulable suspicion while both he and the defendant were within the [MP's] zone of authority." Id. at 572. That is not what occurred in this case. Delker was never within Chief Langston's jurisdiction on the night of Christmas Eve 2005. He most certainly never committed a violation of any law within Chief Langston's jurisdiction.
[12] Delker argues that the posted speed limit of thirty-five miles per hour was not established in the manner mandated by law. In the post-trial proceedings before the circuit court, Delker attempted to present evidence that, on January 10, 1975, the Lauderdale County Board of Supervisors had originally established a default speed limit of fifty-five miles per hour on all county roads unless the Board determined, on the basis of a commissioned engineering and traffic study, that a lower speed limit was necessary. Delker also attempted to demonstrate that, on October 7, 1996, the Board had adopted an amended order, without referencing an engineering and traffic study, that changed the default speed limit from fifty-five miles per hour to forty miles per hour. Assuming without finding that the modified default speed limit meets the requirements of Mississippi law, there appears to be no engineering and traffic study or even an order by which the Board modified the speed limit on Old Country Club Road to thirty-five miles per hour. It appears that the thirty-five miles per hour posted speed limit on Old Country Club Road was set randomly and without an order by the Board. However, my opinion does not turn on whether Delker was actually speeding, but whether Chief Langston's stop violated Delker's constitutional rights.
[13] On December 24, 2005, Delker was driving a red Mercury four-door car. The record reflects that, on December 8, 2005, Delker was stopped while driving the same car bearing the same license plate number. Neither the prosecution nor the defense asked Chief Langston what Delker was driving when Chief Langston stopped Delker in November 2005. Likewise, neither the prosecution nor the defense asked Chief Langston whether he ran the license plate of Delker's car prior to realizing that Delker was driving, or if he did not run the license plate of the car, why he did not request that information. The record also reflects that Chief Langston issued a citation to Delker charging him with driving without a driver's license during the November incident. One might be inclined to conclude that, when Chief Langston saw Delker's red Mercury car on the night of Christmas Eve, Chief Langston may have determined that Delker needed to be stopped again to check the status of his driver's license. However, such a conclusion must be based on speculation because Chief Langston testified, under oath, that he did not know who was driving the small red Mercury car when he began his pursuit. Otherwise, there is no testimony to contradict Chief Langston's claim that he did not know who was driving the car. I am disinclined to compare Chief Langston with Sergeant Schultz of fame from the television series "Hogan's Heroes" who often claimed, "I know nothing  nothing!"